**Paul C. MAGGIO, d/b/a Patchogue Nursing Center, Plaintiff,**

v.

**LOCAL 1199, etc., et al., Defendants.**

**LOCAL 1199, etc., et al., Plaintiffs,**

v.

**Paul C. MAGGIO, d/b/a Patchogue Nursing Center, Defendant.**

**Nos. CV 88–1352, CV 88–1793.**

United States District Court,
E.D. New York.

Jan. 4, 1989.

Block, Amelkin & Hamburger by Frederic Block, Smithtown, N.Y., for Maggio d/b/a Patchogue Nursing Center.

Gladstein, Reif & Meginniss by Amy Gladstein, Brooklyn, N.Y., for Local 1199, et al.

O'Connell & Aronowitz by Cornelius D. Murray, Albany, N.Y., for New York State Health Facilities Ass'n.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

In these consolidated cases the Court must decide whether to confirm or vacate an arbitrator's decision to reinstate and award back pay to an employee. The employee at issue is Clifford Ackley ("Ackley") a member of Local 1199 of the Drug, Hospital and Health Care Employees Union (the "Union"). The employer is Paul C. Maggio ("Maggio" or the "Employer") who operates the Patchogue Nursing Center ("PNC"). In a prior order of this Court permission was granted to the New York State Health Facilities Association

("NYSHFA") to participate in this litigation as *amicus curiae.*

Both the Employer and NYSHFA seek to have the award vacated on the ground that its enforcement would violate the clearly articulated public policies of the state of New York and of the United States of America. Arguing that no such conflict exists the Union seeks confirmation of the award. After outlining the background of the case the Court will turn to address the parties' contentions.

## I. BACKGROUND

### A. *Proceedings Before the Commissioner of the New York State Department of Health*

On February 23, 1987 Ackley was discharged from his employment as a Nurse's Aide at PNC. The next day Maggio sent a report to the Commissioner of the Office of Health Systems Management of the New York State Department of Health (the "Commissioner") detailing the reasons for Ackley's discharge (the "February 24 Report"). The February 24 Report was sent pursuant to Section 2803–d of New York's Public Health Law, a statute discussed in greater detail below, that requires people such as Maggio to report suspected incidents of "physical abuse, mistreatment or neglect" of persons receiving care in residential health facilities like PNC. *See* N.Y. Pub.Health L. § 2803–d. Although the February 24 Report is not before the Court subsequent events and documents generated after February 24, 1987 make clear that Ackley was discharged because his employer believed that Ackley had physically abused four individuals residing at PNC.

In a letter dated December 9, 1987 a representative of the Commissioner stated that an investigation conducted on February 26, 1987 revealed that sufficient credible evidence existed tending to show that the four alleged acts of physical abuse had indeed occurred. Notwithstanding this finding of patient abuse, the Commissioner declined to exercise his power, pursuant to New York law, to impose a fine on Ackley. Instead, the Commissioner stated that the February 24 Report would remain in the files of the Department of Health and that the December 9, 1987 letter would serve as "an admonishment" for Ackley's conduct.

Shortly after receipt of the December 9, 1987 letter, Ackley's attorney wrote to the Commissioner asking that the record of Ackley's physical abuse of patients be expunged or, in the alternative, seeking a hearing to determine the merits of the charge of physical abuse. In a letter dated February 23, 1988 the Commissioner informed Ackley's attorneys that no reason existed to amend or expunge the findings expressed in the December 9, 1987 letter. Although the February 23, 1988 letter referred to Ackley's right to a hearing the Court is unaware of any effort taken by either side to schedule that hearing.

### B. *Arbitration Proceeding*

At the same time that the foregoing proceedings before the Commissioner were taking place, Ackley exercised his right, pursuant to a collective bargaining agreement entered into between the Employer and the Union, to seek arbitration of the issue of whether Ackley was discharged for cause. Hearings were held before an arbitrator on October 1, 1987, January 26, 1988 and February 25, 1988. On March 30, 1988 the arbitrator rendered his opinion and award (the "Award").

Although the precise issue before the arbitrator—whether or not Ackley was fired for cause—was not discussed in any of the Commissioner's letters, the factual circumstances regarding the firing are identical to those that prompted the issuance of the February 24 Report. Because actual hearings were held before the arbitrator the Award discusses, in much greater detail than any documents generated during the course of the proceedings before the Commissioner, the circumstances of alleged physical abuse. The four patients discussed in the Award are Florence Cattani, Anthony Ingoglia, Ruth Krause and Leon Cootner. These individuals are elderly residents of PNC who require extensive care and assistance in the activities of daily living.

After reviewing the charges and the testimony of witnesses the arbitrator held that Ackley had not abused Cattani or Cootner. Although the arbitrator found Ackley guilty of mistreating Ingoglia and Krause, he held that such mistreatment was not intentional but was a result of rough handling stemming from carelessness that could be attributed to Ackley's "size, bulk, strength and, at times, being rushed to perform chores." Under these circumstances the arbitrator determined that the appropriate remedy was a suspension period of one month without pay. Since the one month period had elapsed by the date of the Award, the arbitrator held that Ackley was entitled to immediate reinstatement and back pay from March 23, 1987 to the date of reinstatement. After the submission of post-arbitration memoranda the arbitrator issued a supplemental opinion and award. That supplemental award is dated May 25, 1988 and fixes the amount of back pay at $11,349.82 plus interest accrued from the date of April 15, 1988 to the date of reinstatement.

## II. THE PRESENT MOTION

As noted above, the Union now moves, on behalf of Ackley, for confirmation of the arbitrator's award. The Employer and NYSHFA oppose the Union's application on the ground that confirmation violates public policy. In the event that this Court confirms the award, the Employer concedes that the amounts fixed by the supplemental award are appropriate.

The public policy argument is two-fold. First, it is argued that the comprehensive state and federal statutory scheme that, among other things, gives the Commissioner broad powers to adjudicate instances of suspected patient mistreatment, leaves labor arbitrators with no jurisdiction to rule on such matters. Second, it is argued that even if an arbitrator has the power to decide whether mistreatment has taken place, the remedy of reinstatement is unavailable when the arbitrator makes factual findings akin to those made in the present case.

### A. General Principles

As a starting point the Court notes that the policy favoring labor arbitration is strong and the circumstances allowing the Court to review the merits of an award are, therefore, narrow. See Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960); 9 U.S.C. § 10 (setting forth the limited circumstances allowing a Court to vacate an arbitration award). Although Courts have long recognized their ability to refuse confirmation of an arbitrator's award on the ground that enforcement would violate public policy, the aforementioned bias in favor of labor arbitration has resulted in the rare application of the public policy doctrine. See, e.g., Local 453, Internat'l Union of Electrical Radio and Machine Workers v. Otis Elevator Co., 314 F.2d 25 (2d Cir.), cert. denied, 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963).

In United Paperworkers Internat'l Union v. Misco, Inc., 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), the Supreme Court explained the scope of the public policy exception to enforcement of a labor arbitrator's award. The Court noted that the doctrine has its roots in the common law notion that a court will refuse to enforce a contract that violates public policy because no court will "lend its aid to one who founds a cause of action upon an immoral or illegal act...." Id. 108 S.Ct. at 373.

Although the Supreme Court has held the public policy doctrine applicable to labor arbitration cases, it has cautioned against the broad application of the doctrine to invalidate a labor arbitrator's award. Thus, an arbitrator's award should be found to violate public policy only under those rare circumstances where enforcement will violate a "well defined and dominant" policy. Id. at 374. See also W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983); Muschany v. United States, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945). That policy must be "ascertained 'by a reference to the laws and legal precedents and not from general

considerations of supposed public interests.'" *Misco*, 108 S.Ct. at 374 (citations omitted). Once the policy is identified, the party seeking to have the award vacated must show that a sufficient link exists between enforcement of the award and violation of the policy to warrant the refusal to confirm the award. *See Misco*, 108 S.Ct. at 374.

In *Misco*, the Supreme Court reversed a holding of the Court of Appeals for the Fifth Circuit that refused confirmation of a labor arbitrator's award on the ground that its enforcement would violate public policy. There, the employee at issue was found guilty, in a separate criminal proceeding, of possession of marijuana. Although the arbitrator found that the employee was in a marijuana smoke-filled car in the company parking lot, he held that insufficient evidence of drug use on company property existed to warrant the firing. Accordingly, the award ordered that the employee be reinstated.

Because the employee operated heavy, dangerous machinery, the employer argued that the reinstatement violated public policy. The District Court agreed and held that enforcement would violate the public policy against the operation of heavy machinery while under the influence of drugs as well as the policy evidenced by state criminal laws against drug possession. The Court of Appeals affirmed holding that reinstatement of the employee would violate the policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." *Misco*, 108 S.Ct. at 369, *quoting, Misco, Inc. v. United Paperworkers Internat'l. Union*, 768 F.2d 739, 743 (5th Cir.1985).

After setting forth the narrow circumstances under which the public policy doctrine is to be applied, the Supreme Court reversed the holding of the Circuit Court. First, the Supreme Court noted that the Circuit Court's pronouncement of public policy was in error because the lower court did not refer to existing laws and precedents to establish a " 'well-defined and dominant' policy against the operation of dangerous machinery while under the influence of drugs." *Misco*, 108 S.Ct. at 374. Since the policy relied upon was based upon nothing more than "general considerations of supposed public interests" the Court held that it did not constitute the type of policy upon which a court could rest its decision to invalidate an arbitrator's award. *Id*.

The Supreme Court went on to state that even if the lower court's formulation of "public policy" was correct, refusal to enforce the award was nonetheless unwarranted. Fatal to vacation of the award was the lower court's failure to demonstrate a sufficient link between enforcement of the award and violation of the previously identified public policy. *See Misco*, 108 S.Ct. at 374. Specifically, the Supreme Court observed that since any connection between the finding of traces of marijuana in the employee's car and the use of drugs while operating dangerous machinery was "tenuous at best," that link provided an insufficient basis upon which to invalidate the arbitrator's award. *Id*.

### B. *The Public Policy Argument At Issue in This Proceeding*

In support of the argument that enforcement of the Award would violate public policy Maggio points to both state and federal statutes. Specifically, Maggio relies on: (1) Section 2803 of New York's Public Health Law; (2) sections of New York's Code of Rules and Regulations ("NYCRR") that deal with a nursing home operator's duty to provide qualified personnel and (3) sections of the Federal Omnibus Budget Reconciliation Act of 1987 that deal with nursing home reform. As noted above it is argued that these statutes evidence an intent to place the issue of patient mistreatment beyond the purview of an arbitrator or, in the alternative, that the policy evidenced by these statutes prohibits reinstatement of Ackley under the factual findings of the Award.

#### i. *The Public Health Law*

Section 2803–d of New York's Public Health Law sets forth a procedure for the reporting of suspected instances of abuse of persons who receive care in nursing

homes like PNC. Under the law certain specified individuals are required to report instances of suspected "physical abuse, mistreatment or neglect" of persons receiving care in residential health care facilities. *See* N.Y.Pub.Health L. § 2803–d (McKinney 1985). The statute further provides that an investigation of the charges is to be carried out by the Commissioner. After the Commissioner's findings are communicated to the individual charged, that person may ask that any adverse findings be expunged from his employment record. Based upon the individual's request, the Commissioner can expunge the record or find that sufficient credible evidence of a violation of the law exists and refuse to expunge the record. After the Commissioner acts upon the request to expunge, the individual has the right to a hearing where the burden of proving the charges is on the Commissioner. N.Y.Pub.Health L. § 2803–d(6)(a–d) (McKinney 1985).

Maggio's public policy argument is also based upon Section 2803–c of New York's Public Health Law. That law requires facilities like PNC to "adopt and make public a statement of the rights and responsibilities of the patients who are receiving care in such facilities," and to "treat such patients in accordance with the provisions of such statement." N.Y.Pub.Health L. § 2803–c (McKinney 1985). The law provides that the statement of rights contemplated by the statute must include, *inter alia*, the right of every patient: (1) "to receive courteous, fair and respectful care and treatment," N.Y.Pub.Health L. § 2803–c(3)(g) (McKinney 1985) and (2) to be "free from mental and physical abuse." N.Y.Pub.Health L. § 2803–c(3)(h) (McKinney 1985).

### ii. *NYCRR*

The section of the NYCRR relied upon by Maggio imposes a duty upon the operators of nursing facilities to provide personnel who are qualified to provide services necessary to promote the "health, safety, proper care and treatment" of residents and to ensure that members of the facility's staff "refrain from abusive, immoral or other unacceptable conduct, behavior or language." 10 NYCRR § 414.17.

### iii. *State Law Penalties*

The state law penalties that can be imposed for violation of the aforementioned state statutes and regulations are: (1) a penalty of up to one thousand dollars per day for continuing violations of rules promulgated pursuant to the Public Health Law, *see* N.Y.Pub.Health L. § 2803(6) (McKinney 1985); (2) penalties of up to one thousand dollars a day for a continuing violation of the provisions of the NYCRR referred to above, *see* 10 NYCRR § 732.1; (3) a penalty of up to two hundred and fifty dollars per day for each violation of the Public Health Law, *see* N.Y.Pub.Health L. § 12 (McKinney 1971) and (4) if the violation at issue is deemed wilful, the finding of guilt of the commission of a misdemeanor, *see* N.Y.Pub.Health L. § 12–b (McKinney 1971). Specifically, the Commissioner does not have the power to require that a health care employee be fired.

### iv. *Federal Law*

In addition to relying on the aforementioned provisions of state law, Maggio relies on certain provisions of federal law to support the public policy argument. Specifically, Maggio points to provisions of the Omnibus Budget Reconciliation Act of 1987 ("OBRA") that set forth certain requirements for the quality of care provided by nursing facilities. *See* Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, § 4201, 101 Stat. 1330–160 (1988) (to be codified at 42 U.S.C. § 1395x) (hereinafter cited as "OBRA").

OBRA amends section 1819 of Title 28 of the Social Security Act ("Section 1819") by adding a section entitled "Requirements Relating to Provision of Services." Thus, Section 1819 now provides that a nursing facility "must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident." § 1819(b)(1)(A). On a more specific level, the newly amended Section 1819 discusses required training of individuals who work as nurses aides in nursing facilities. While that portion of the statute sets forth a

fairly comprehensive training and evaluation procedure for nurses aides, it will apply to a nurses aide in Ackley's position only as of January 1, 1990. *See* § 1819(b)(5)(B). The final portion of OBRA relied upon by Maggio mirrors the "patients' rights" provision of state law and requires nursing facilities to protect the right of each resident to be "free from physical or mental abuse." § 1819(c)(1)(A).

### v. *Federal Law Penalties*

The penalties that may be imposed for violation of the aforementioned sections of OBRA relate primarily to the Federal government's ability to terminate a facility's right to participate in the Medicare program and to impose fines. If a facility is not in compliance with OBRA and the Secretary of Health and Human Services (the "Secretary") finds that the health or safety of residents is in immediate jeopardy the Secretary must appoint a temporary manager of the facility or terminate the facility's ability to participate in Medicare or Medicaid. § 1819(h)(2)(A)(i). If a facility is not in compliance with the requirements of OBRA but that non-compliance does not jeopardize the immediate health or safety of residents, the Secretary may terminate the facility's ability to participate in Medicare or Medicaid or can: (1) deny payment for new admissions; (2) impose civil penalties of $10,000 for each day of non-compliance or (3) appoint temporary management to operate the nursing facility. § 1819(h)(2)(A)(ii); § 1819(h)(2)(B).

### C. *Would Enforcement of the Award Violate Public Policy?*

As noted above, an arbitrator's award will be vacated on public policy grounds only if: (1) the policy relied upon is "well-defined" and "dominant" and (2) a clear link exists between enforcement of the award and violation of the policy. *See Misco*, 108 S.Ct. at 374.

The first policy said to be evidenced by the statutes noted above is a policy vesting the Commissioner with the exclusive right to investigate, review and decide patient abuse cases in the State of New York. In support of their exclusivity argument Maggio and NYSHFA point to the statutory scheme referred to above and rely on certain case law.

While the Court agrees that the statutes relied upon give the Commissioner the right and, indeed, the responsibility, to investigate instances of suspected patient abuse, the Court cannot agree that the granting of that right necessarily divests a labor arbitrator of the right to rule upon an employee's grievance when it is concerned with such matters. Such a broad ruling would be warranted only if the Court were to find clear legislative intent to place issues of suspected patient abuse outside the jurisdiction of a labor arbitrator. The Court finds no express language evidencing such an intent and cannot glean such an intent from any related legislation.

Although Section 2800 of the Public Health Law provides that the Department of Health shall have the "central, comprehensive responsibility for the development and administration of the state's policy with respect to hospital and related services," N.Y.Pub.Health L. § 2800 (McKinney 1985), such language does not necessarily support the exclusivity argument. Indeed, it appears that this language was chosen to centralize the functions to be assigned to the Department of Health in a single state agency. *See* N.Y.Pub.Health L. § 2800, Historical Note (McKinney 1985) (referring to legislation transferring employees from Department of Social Services to Department of Health). In any event, Section 2800 refers only to "policy making" and states nothing about vesting the Commissioner with exclusive adjudicatory powers. Thus, the statute does little to demonstrate an intent to make the Commissioner the exclusive arbiter of patient abuse cases.

Maggio and NYSHFA also place great reliance on *Cohoes City School Dist. v. Cohoes Teachers Ass'n*, 40 N.Y.2d 774, 390 N.Y.S.2d 53, 358 N.E.2d 878 (1976). There, the New York State Court of Appeals held that an arbitrator could not reinstate a school teacher for a period of time that would ripen into the granting of tenure. The decision to deny reinstatement that would result in the automatic granting of tenure

was based upon the Court's view that a school board cannot, as a matter of law, relinquish tenure decisions to an arbitrator. *Id.* 390 N.Y.S.2d at 55, 358 N.E.2d at 879–80. Thus, the Court affirmed the Appellate Division's decision to allow reinstatement but to withhold the granting of tenure for an additional year to allow the school board additional time in which to evaluate the teacher at issue. *Id.* at 56, 358 N.E.2d at 880–81.

By analogizing a school board's tenure decision to the Commissioner's decisions on physical abuse, it is argued that an arbitrator has no power to rule on cases involving suspected patient abuse. Aside from the fact that *Cohoes* predates controlling Supreme Court authority as outlined in *Misco,* the Court has difficulty accepting the suggested analogy. While a school board has historically retained the right to determine whether or not a teacher should be granted tenure, operators of nursing facilities have not excluded instances of suspected patient abuse cases from the terms of collective bargaining agreements. If Maggio wished to place such cases beyond the purview of an arbitrator, an appropriate term could have been agreed upon. Under the present circumstances, the Court will not use the public policy doctrine to modify the terms of the parties' agreement.

Equally unconvincing is Maggio's assertion that the conflict that may be created between the Commissioner's findings and those of an arbitrator necessarily requires a ruling that the Commissioner has exclusive jurisdiction to investigate suspected cases of patient abuse. According to Maggio, the conflict is demonstrated by the fact that the Commissioner can pursue remedies against Ackley and Maggio despite the arbitrator's contrary findings.

While Maggio's argument may have some abstract appeal, the Court finds it similar to the employer's argument that was rejected by the Second Circuit Court of Appeals in *Local 453, Internat'l Union of Electrical, Radio & Machine Workers v. Otis Elevator Co.,* 314 F.2d 25 (2d Cir.), *cert. denied,* 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963). There, the Court held

that a criminal statute that could expose the employer to prosecution if the employee was guilty of illegal gambling did not preclude enforcement of an arbitrator's award of reinstatement. While the Court recognized the policy against engaging in and fostering illegal activity, the Court held that the possibility that an employer who disciplined an employee for illegal gambling would be found guilty of violating the criminal law was too remote to warrant vacating the award. *Id.* at 29.

Here, too, the possibility of prosecution of Maggio is remote. Although, as noted above, the Commissioner has *the right* to impose penalties on Maggio and Ackley, he did not choose to exercise that right and there is no indication that penalties will be imposed. As noted above, the Commissioner stated specifically that in lieu of exercising the right to impose penalties, a letter detailing the charges against Ackley would be placed in his file and serve as an "admonishment" to Ackley. Under these circumstances it is unlikely that the Commissioner will pursue penalties against Maggio.

Further militating against Maggio's "conflict" argument is that, notwithstanding the differences in the factual findings of the arbitrator and the Commissioner, the penalty actually imposed by the arbitrator is more drastic than any penalty imposed by the Commissioner. Thus, the arbitrator's award has arguably done more to further the public policy against abuse of patients than the Commissioner's own mechanism. *Cf. Local 453,* 314 F.2d at 29 (noting that arbitrator's mandated seven-month layoff without compensation or accrual of benefits arguably did more to vindicate New York's policy against gambling than imposition of a fine for a violation criminal law).

In a similar vein the Court notes that the remedy of firing a patient abuser is not available to the Commissioner. In addition to militating against a finding of a conflict between the Commissioner's remedies and those of an arbitrator, the Court notes that if Ackley were found to have intentionally mistreated residents there is little doubt

that the arbitrator would have found just cause for the termination. Such a finding would similarly further the policy against patient abuse.

In sum, the Court finds no policy vesting the exclusive right to investigate instances of suspected patient abuse in the Commissioner. Accordingly, the Court turns to consider whether, in light of the arbitrator's findings, the remedy of reinstatement is barred by considerations of public policy.

According to Maggio, public policy bars reinstatement of Ackley because the arbitrator found Ackley to be a "patient abuser." If Maggio's characterization of Ackley were correct, the Court would be inclined to agree that reinstatement violated public policy. There is little doubt that the above-referenced statutes evidence a policy that seeks to protect residents of health care facilities from being subject to physical abuse. The mere statement that reinstatement here violates public policy, however, does not satisfy the Supreme Court's requirement that a sufficient link be shown between enforcement of the award and violation of the public policy.

As noted above, the award was rendered after hearings and discusses the instances of alleged abuse in great detail. Although the Award uses the term "mistreatment" when discussing how Ackley handled patients Ingoglia and Krause, a fair reading of the Award reveals that Ackley did not engage in the type of conduct that the aforementioned statutory scheme seeks to prevent. Specifically, as noted above, the Award noted that any "rough handling" on Ackley's part could be attributed to his "size, bulk, strength and, at times, being rushed to perform chores." Given the fact that Ackley did not intentionally abuse patients the arbitrator held that the firing was not for just cause.

Indeed, a fair reading of the Award reveals that the arbitrator's opinion is completely in line with the policy identified by Maggio. Thus, the Award states that "patient abuse is totally unacceptable" and notes that the elderly in nursing homes are in need of special care and are totally at the mercies of those who care for them. Thus, this Court has little doubt that if the arbitrator found Ackley to be a true "patient abuser," there is little doubt that the arbitrator would have upheld the firing. Since the Court finds no link between the policy protecting patients from physical abuse and enforcement of the Award, the Court declines to vacate the Award on the ground that, under the terms of the Award, the remedy of reinstatement is prohibited by public policy.

Finally, the Court notes that in the event that an actual conflict existed, the ruling in this case might be different. If, for example, the Commissioner were to find that Maggio should be fined one thousand dollars for every day that Ackley remains employed at PNC, the Court would likely find that the forced reinstatement violates clearly articulated public policy. In such a case, Ackley's conduct would, no doubt, be found to rise to the level that would violate the policy against mistreatment of patients. Where, as here, however, the Commissioner has issued only an admonishment, the Court cannot find that a conflict warranting denial of confirmation of the award exists.

### CONCLUSION

After reviewing the state and federal statutory scheme regulating the care to be provided residents of health care facilities the Court holds that public policy does not prohibit a labor arbitrator from determining whether just cause exists for a union member's firing where the proferred reason for the firing is the suspected abuse of patients. Because the Court finds that the remedy of reinstatement in this case does not violate the policy prohibiting the abuse of patients the Court declines to vacate the award on the basis that enforcement violates public policy. Accordingly, the award is confirmed.[1]

SO ORDERED.

1. Maggio has also raised, in a footnote to the

brief, the argument that the arbitrator's failure

to accept the Commissioner's findings into evidence constitutes a separate ground for vacating the award under 9 U.S.C. § 10(c). Since Maggio has raised this argument only in a footnote, this Court will respond in a similar fashion. An arbitrator's award will not be set aside for failure to accept a document into evidence unless that ruling deprives the parties of a "fundamentally fair hearing." *Bell Aerospace Co. Division of Textron, Inc. v. Local 516,* 500 F.2d 921, 923 (2d Cir.1974). Here, the Court cannot find that the failure to accept a preliminary finding of an agency that held no hearing prior to issuing its ruling, deprived Maggio of the right to a fair hearing. Accordingly, the Court cannot set aside the award based on a violation of 9 U.S.C. § 10(c). *See Misco,* 108 S.Ct. at 372 (refusing to set aside award based on arbitrator's refusal to accept evidence where arbitrator's error "was not in bad faith or so gross as to amount to affirmative misconduct").