**RUSSELL MEMORIAL HOSPITAL ASSOCIATION, Plaintiff and Counter–Defendant,**

v.

**UNITED STEELWORKERS OF AMERICA, Defendant and Counter–Plaintiff.**

No. 88–CV–10223–BC.

United States District Court, E.D. Michigan, N.D.

Aug. 10, 1989.

William H. Fallon, Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., for plaintiff and counter-defendant.

Kim Arthur Siegfried, Asst. Gen. Counsel, United Steelworkers of America, AFL–CIO–CLC, Allen Park, Mich., for defendant and counter-plaintiff.

## MEMORANDUM OPINION

CHURCHILL, Chief Judge.

Plaintiff Russell Memorial Hospital Association ("the Hospital") operates a seventeen-bed hospital in Onaway, Michigan. Defendant United Steelworkers of America ("the Union") is the certified bargaining representative for service, maintenance, technical, and clerical employees working at the Hospital. Sharon Repke, a licensed practical nurse at the Hospital, was discharged for negligence in administering medication. The Union grieved her discharge in accordance with the collective bargaining agreement. An arbitrator ruled in favor of the Union, and ordered Repke's reinstatement with full seniority rights, but without back pay.

The Hospital then filed suit to vacate the arbitration award, contending that enforcement of the award would violate public policy.[1] The Union counterclaimed, arguing that the integrity of the collective bargaining process required the Court to defer to an arbitrator's reasonable interpretation of the labor agreement. Cross-motions for summary judgment have been filed. Be-

---

1. The Hospital also asserts that the arbitrator exceeded his authority in rendering an award, and thus the award should be vacated. Since the Court resolves this dispute on the basis of the public policy argument, it does not reach the issue of whether the arbitrator exceeded his authority.

cause the Court concludes that enforcement of the arbitration award would violate established Michigan public policy, the Hospital's motion will be granted and the Union's motion will be denied.

## I. Factual Setting

When an arbitration award is challenged on public policy grounds, a court does not engage in *de novo* review, but takes the facts as found by the arbitrator. *See Board of County Commissioners v. L. Robert Kimball & Assoc.,* 860 F.2d 683, 686 (6th Cir.1988). The evidentiary record considered by the arbitrator reveals the following.

Sharon Repke had been employed at the Hospital as a licensed practical nurse since 1981. For approximately six years, Repke performed her job without incident. *See* Arbitrator's Opinion and Award, p. 10. In 1987, however, Repke became embroiled in a series of events that eventually led to her discharge. On March 12, 1987, Repke left her work area without informing her supervisor, and consequently received a warning for "defective and improper work." *See id.* Three weeks later, Repke was reprimanded for "failure to obey orders." *See id.* Then, on October 27, 1987, Repke was involved in an act of insubordination in the Hospital's emergency room. *See id.,* pp. 4–5; *see also* Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, p. 4 (reciting allegations that Repke "threw the leads of an EKG monitor" at the emergency room physician).

Immediately thereafter, Repke met with the Hospital's Director of Nursing and reviewed the emergency room incident and Repke's record, including previous allegations of her negligent failure to administer medication which had not resulted in the taking of formal disciplinary action against Repke. By way of response, Repke stated: "You're just banging your head against a brick wall," *see* Arbitrator's Opinion and Award, p. 11; according to the nursing director, Repke simply "did not admit to having any problems." *Id.* Repke was then placed on probation for thirty days, the conditions of which were that Repke be "monitored closely" and discharged immediately if another complaint was filed. *See id.,* p. 5.

On November 7, 1987, a patient at the Hospital notified the nursing supervisor that Repke had failed to give the patient three different cardiac medications at 2:00 p.m. as prescribed by the attending physicians. *See id.,* pp. 2–3. When confronted by the nursing supervisor, Repke stated that she had indeed dispensed the 2:00 p.m. medication. *Id.,* p. 3. Yet when the supervisor checked the patient's medication record, there was no notation that the medication had been dispensed. *Id.* (Repke entered such a notation in the patient's record the next day. *Id.*) In addition, the nursing supervisor examined the three bottles of medication and calculated that each bottle contained one more pill than there would have been if Repke dispensed the 2:00 p.m. medications as she had stated. *See id.,* p. 4. When questioned about the discrepancy, Repke replied: "I might as well quit now." *Id.* On November 18, 1987, the Hospital notified Repke that her employment was terminated.

The sole issue before the arbitrator was whether Repke was discharged "for cause" in accordance with the collective bargaining agreement. The Hospital contended that Repke's negligent failure to dispense the medication violated the terms of her probation, which it construed as a "last chance agreement," and thus the discharge was necessarily "for cause." The arbitrator rejected this argument, however, and ruled that Repke's discharge for violating the probation was not dispositive of the "for cause" issue.

The arbitrator then continued the inquiry and noted that several factors concerning the November 7, 1987 incident "strongly point to [Repke]'s culpability." *See id.,* p. 4. The arbitrator also observed that the incident represented "substantive misconduct" which "could have detrimentally impacted the patient's health," *id.,* p. 10; that Repke had "an uncooperative attitude" and "tends to insubordinate conduct," *id.,* pp. 10–11; and that Repke had been disciplined twice within the preceeding eight months.

Despite these factors, the arbitrator felt that Repke's discharge was largely motivated by her violation of the probation and that such a violation did not automatically lead to discharge "for cause." *Id.*, p. 12. "[W]eighing all the circumstances," the arbitrator concluded that Repke's discharge was not "for cause" within the meaning of the contract, and ordered her reinstated. *Id.*, pp. 12–13.

## II. Scope of Review

In general, judicial review of arbitration awards is extremely limited. *See, e.g., Eberhard Foods, Inc. v. Handy*, 868 F.2d 890, 891 (6th Cir.1989). As the Supreme Court recently stated, "courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286, 298 (1987). Instead, the courts' role "is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *See Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 567, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). As long as the arbitrator's award "draws its essence from the collective bargaining agreement" and does not merely reflect the arbitrator's "own brand of industrial justice," the award should be enforced. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

In 1983, the Supreme Court recognized an exception to the limited judicial review of arbitration awards. "[A] court may not enforce a collective bargaining agreement that is contrary to public policy[.]" *See W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). This exception is restricted to situations in which the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant." *Id.*, 461 U.S. at 766, 103 S.Ct. at 2183. Moreover, the public policy is "to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.*, 461 U.S. at 766, 103 S.Ct. at 2177 (quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)).

This public policy exception to the enforcement of arbitration awards was recently reaffirmed in *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). Reiterating that the public policy exception is narrow, the *Misco* Court held that a court may vacate an arbitrator's award in two instances: (1) when the specific terms of the collective bargaining agreement violate public policy and (2) when the award creates an explicit conflict with other "laws and legal principles." *Id.*, 484 U.S. at 43, 108 S.Ct. at 373, 98 L.Ed.2d at 302. With respect to a purported conflict between enforcement of an award and other laws and legal principles, "a refusal to enforce an award must rest on more than speculation or assumption." *Id.*, 484 U.S. at 44, 108 S.Ct. at 374, 98 L.Ed.2d at 303. Thus, an arbitrator's award will be vacated as conflicting with public policy only if: (1) the policy relied upon is "well defined" and "dominant" and (2) a clear link exists between enforcement of the award and violation of the public policy.

## III. Discussion

### A. Michigan's Public Policy

Initially, the Court must examine whether the asserted public policy is "well defined and dominant" and whether it rests on "laws and legal principles" or simply "general considerations of supposed public interest." *See Misco*, 484 U.S. at 44, 108 S.Ct. at 374, 98 L.Ed.2d at 302. The Hospital argues that enforcement of the arbitrator's award in this case would violate Michigan's public policy of ensuring safe and competent nursing care. The Court has identified several factors which suggest that Michigan has a public policy of ensuring safe and competent nursing and that such a policy satisfies the dictates of *Misco.*

First, the people of Michigan, speaking through their legislators, have evidenced a concern for the delivery of safe and competent nursing care since 1909 when the first state board was established to license and regulate the practice of nursing. *See* 1909 Mich.Pub.Acts 319. It remains illegal to practice nursing without a license. *See* M.C.L.A. § 333.17211. In addition, Michigan's comprehensive public health code, which is intended "to protect and promote the public health," *see* 1978 Mich.Pub.Acts 368, specifically regulates the practice of nursing. *See* M.C.L.A. §§ 333.17201 *et seq.* Furthermore, nurses are subject to a variety of sanctions, including revocation of their license, for misconduct associated with the performance of their duties. *See id.,* §§ 333.16221, 333.16226. This concern for the provision of safe and competent nursing care is further reflected in the criminalization of the knowing placement of misleading or inaccurate information on a patient's medical record. *See id.,* § 750.492a.

The Court finds that these statutory provisions reflect the type of "well defined" and "dominant" public policy in favor of providing safe and competent nursing care that could properly form the basis for setting aside an arbitration award. *See also Delta Air Lines, Inc. v. Air Line Pilots Ass'n,* 861 F.2d 665, 672 (11th Cir.1988) (interpreting state statutes, federal regulations, and case law to find a public policy against the operation of aircraft while intoxicated); *Stead Motors v. Automotive Machinists Lodge No. 1173,* 843 F.2d 357, 359 (9th Cir.1988), *reh'g en banc granted,*

857 F.2d 682 (1988) (construing state statutes as establishing a California public policy concerning automobile safety and maintenance); *Iowa Elec. Light & Power Co. v. Local Union 204,* 834 F.2d 1424, 1428–29 (8th Cir.1987) (relying on federal regulatory scheme to find a national policy requiring strict adherence to nuclear safety rules).

## B. Conflict with Public Policy

Since *Misco,* several federal courts have decided cases on facts parallel to those presented here. That is, an employee is discharged for non-drug related misconduct, the discharge is grieved, the arbitrator orders the employee reinstated, and the award is challenged as jeopardizing public safety.[2] In three instances, the arbitration award was vacated as conflicting with an established public policy. *See Delta Air Lines,* 861 F.2d 665 (11th Cir.1988) (vacating award that reinstated an airline pilot who flew passenger plane while intoxicated); *Stead Motors,* 843 F.2d 357 (9th Cir. 1988) (vacating award that reinstated an auto mechanic who "recklessly" failed to tighten lug bolts when repairing a car); *Iowa Elec. Light & Power Co.,* 834 F.2d 1424 (8th Cir.1987) (vacating award that reinstated a nuclear power plant employee who "deliberately" and "thoughtlessly" violated Nuclear Regulatory Commission regulations).

The cases in which the arbitration award was upheld involved situations in which the reviewing court found the link between enforcement of the arbitration award and violation of public policy tenuous given the

---

**2.** The Union relies upon two cases that are readily distinguishable from this factual paradigm. For instance, *Daniel Constr. Co. v. Local 257, IBEW,* 856 F.2d 1174 (8th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1140, 103 L.Ed.2d 200 (1989), involved an award of back pay, not reinstatement. As the *Daniel* court itself noted, "no public safety concerns are implicated by the arbitrator's award of back pay, as opposed to an order returning a potentially dangerous employee to the workplace[.]" *Id.,* 856 F.2d at 1182.

In addition, the award in *The Joseph & Feiss Co. v. Amalgamated Clothing & Textile Workers Union,* 861 F.2d 720 (6th Cir.1988) was not challenged on public safety grounds. There, the

employee was discharged for violating company rules by manipulating her weekly earnings so as to qualify for unemployment benefits. In challenging the arbitrator's award, the employer argued that reinstatement would violate Ohio's public policy against fraudulent misrepresentations by applicants seeking unemployment compensation. The Sixth Circuit rejected this argument, holding that the arbitrator's award itself must violate the asserted public policy. While this "limitist" view is routinely employed in non-public safety cases, *see* E. Nowikowski, *Public Policy Exception to the Enforcement of Labor Arbitration Awards,* 68 Mich.B.J. 626, 626 (July 1989), the Court declines to extend the "limitist" view to public safety cases.

arbitrator's findings. For instance, in *United States Postal Serv. v. National Ass'n of Letter Carriers*, 839 F.2d 146 (3d Cir.1988), a long-term postal carrier was discharged when, in an emotional outburst, he fired gunshots at his supervisor's empty car, which was parked in the post office lot. The arbitrator, however, found that the employee was "amenab[le] to discipline" and "showed no proclivity to further aggression," *see id.*, 839 F.2d at 149, and ordered the employee reinstated. Relying upon the specific factual findings by the arbitrator, the court refused to vacate the arbitration award on public policy grounds.

Similarly, *Flushing Hosp. and Medical Center v. Local 1199*, 685 F.Supp. 55 (S.D. N.Y.1988), involved a nursing attendant who illegally engaged in the practice of nursing by changing a patient's intravenous bag and was subsequently discharged. The arbitrator specifically found that the nursing attendant "acted out of concern for the patient's health and safety and 'that her performance ... was condoned if not invited.' " *Id.*, 685 F.Supp. at 57 (quoting arbitrator's opinion). Citing these findings, the court declined to vacate the award reinstating the nursing attendant.

Finally, in *Maggio v. Local 1199*, 702 F.Supp. 989 (E.D.N.Y.1989), a nurse's aide was discharged because his employer believed that he had physically abused four residents at a nursing center. The court noted that a fair reading of the arbitrator's award revealed that the nurse's aide did not engage in the type of conduct prohibited by a statutory scheme concerning physical abuse of health care facility residents, that any "rough handling" of the residents could be attributed to the aide's "size, bulk, strength and, at times, being rushed to perform chores," and that the aide did not intentionally abuse the residents. *Id.*, 702 F.Supp. at 996. As a result, the court

refused to set aside the arbitrator's award of reinstatement.

In this case, however, the arbitrator explicitly found that Repke's conduct was negligent and that this negligence was "extremely serious" and "could have detrimentally impacted the patient's health." [3] *See* Arbitrator's Opinion and Award, p. 10. Moreover, the arbitrator found that Repke had a propensity for misconduct and that she was reluctant to change her ways. *See id.*, pp. 10–11. Quite simply, Repke's reinstatement would directly conflict with Michigan's established public policy of ensuring the delivery of safe and competent nursing care. Thus, her reinstatement would be more akin to that of the alcohol-drinking airline pilot, the "reckless" auto mechanic, and the "thoughtless" nuclear power plant operator and is distinguishable from the reinstatement of the postal employee who "showed no proclivity to further aggression," the nursing attendant who "acted out of concern for the patient's health and safety," and the nurse's aide whose incidents of "rough handling" were unintentional.

## IV. Conclusion

The Court finds that Michigan has an established public policy in favor of ensuring the delivery of safe and competent nursing care. Given the specific findings by the arbitrator, however, Michigan's public policy would be violated by Repke's reinstatement. Therefore, the arbitrator's award will be vacated, the Hospital's motion for summary judgment will be granted, and the Union's cross-motion will be denied.

An appropriate order will enter.

---

**3.** The arbitrator did not expressly find Repke incompetent. *Cf. Brigham & Women's Hosp. v. Massachusetts Nurses Ass'n*, 684 F.Supp. 1120 (D.Mass.1988) (refusing to set aside an arbitrator's award in light of the absence of a finding by the arbitrator that a nurse who failed to notify a doctor about sudden changes in a pa-

tient's blood pressure was incompetent or unable to properly carry out the basic responsibilities of a registered nurse). Although the case at bar may be factually distinguishable from *Brigham*, to the extent the logic of the two cases is inconsistent, the Court rejects *Brigham*.