**UPMC, BRADDOCK, Plaintiff,**

v.

**TEAMSTERS LOCAL 250, a/w the International Brotherhood of Teamsters Chauffeurs, Warehousemen and Helpers of America, Defendant.**

**No. 98–862.**

United States District Court,
W.D. Pennsylvania.

Oct. 22, 1998.

Edward McGinley Jr, Univ of PGH Medical Cent., Pittsburgh PA, William Klemick, Eckert Seamans Cherin & Mellott, Pittsburgh, PA, for plaintiff.

Ernest Orsatti, Jubelirer Pass & Intrieri, Pittsburgh, PA, for defendant.

## OPINION and ORDER OF COURT

AMBROSE, District Judge.

Plaintiff UPMC–Braddock ("the Hospital"), a not-for-profit acute care hospital facility, discharged Michael Simko ("Simko"), a psychiatric technician, for various rules violations. Specifically, the Hospital claimed that Simko failed to keep a suicidal patient under constant observation, that he falsified hospital records in this regard, and that he possessed a dangerous weapon while tending to the patient. The Defendant, Teamsters Local 250 a/w The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("the Union"), which represents the Hospital's employees, grieved Simko's discharge.

The arbitrator determined that Simko's neglect of a patient and falsification of records merited discipline, but that the charge of possession of a deadly weapon was unfounded. As to the level of discipline, the arbitrator found discharge to be unwarranted, and instead imposed a 90 day suspension without pay. The arbitrator further ordered that Simko was to be returned to his former position, and that he was not to lose either seniority or benefits.

The Hospital subsequently commenced this action under the Labor Management Relations Act, 29 U.S.C. § 185, to vacate the award. Pending is the Union's Motion for Summary Judgment (Docket No. 3). The Union argues that the arbitrator's decision draws its essence from the collective bargaining agreement, and that it does not violate any public policy. Characterizing the Complaint as frivolous, the Union also seeks an award of attorney's fees. The Hospital responds that the arbitrator's award violates "the public policy of the Commonwealth of Pennsylvania that patients are entitled to a safe environment while an inpatient in a psychiatric hospital and/or psychiatric unit of an acute care hospital." *See* Complaint, ¶ 8(a).[1]

After careful consideration, and for the reasons set forth below, the Motion is granted in part and denied in part. The Motion is granted insofar as I decline to vacate the arbitrator's award. The Motion is denied, however, to the extent that it seeks the imposition of sanctions.

---

1. Because the Hospital does not base its request to vacate the award on an argument that the decision does not "draw its essence" from the collective bargaining agreement, I will not address the Union's contentions in this regard.

## STANDARD OF REVIEW

"District courts have very little authority to upset arbitrators' awards." *United Transportation Union Local 1589 v. Suburban Transit Corp.,* 51 F.3d 376, ·379 (3d Cir.1995) (citations omitted). However, "[a]rbitration awards rendered pursuant to collective bargaining agreements can be vacated when such awards violate public policy." *United Transportation,* 51 F.3d at 381 (citations omitted). "[T]he public policy must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* (internal quotation marks and citations omitted). As I stated in *Highlands Hospital and Health Center v. The American Federation of State, County and Municipal Employees,* 1996 WL 163947 at *3 (W.D.Pa. Feb.16, 1996), "the award need not violate positive law to conflict with an explicit public policy" (citations omitted).

Application of the public policy exception involves a two step analysis. "The threshold question is whether a well defined and dominant public policy can be identified." *Exxon Shipping Co. v. Exxon Seamen's Union,* 73 F.3d 1287, 1293 (3d Cir.1996). "If so, the court must determine whether the arbitrator's award, as reflected in his or her interpretation of the agreement, violated public policy." *Exxon,* 73 F.3d at 1293. "[T]he violation [of a public policy] must be clearly shown if an award is not to be enforced." *Colella v. Teamsters Pension Trust Fund,* 1996 WL 238566 at * 3 (E.D.Pa. May 7, 1996) (citations omitted). As noted by the Third Circuit, "the public policy exception to the enforcement of arbitration awards is slim indeed." *United Transportation Union Local 1589 v. Suburban Transit Corp.,* 51 F.3d 376, 382 (3d Cir.1995) (internal quotation marks and citations omitted).

## ANALYSIS

(A). *A Well–Defined and Dominant Public Policy*

According to the Hospital, the public policy at issue involves "the protection and care of psychiatric patients in the care of UPMC." *See* Docket No. 10, p. 6. In support of this contention the Hospital refers to the Protection and Advocacy for Mentally III Individuals Act ("the Protection and Advocacy Act"), 42 U.S.C. § 10801 *et seq.,* the Mental Health Rights and Advocacy Act ("the Mental Health Bill of Rights"), 42 U.S.C. § 9501 *et seq.,* Pennsylvania's Mental Health Procedures Act, 50 P.S. § 7101 *et seq.,* and case law. I agree that, in drafting the Protection and Advocacy Act, Congress recognized that "individuals with mental illness are vulnerable to abuse and serious injury," and that Congress defined "abuse" as "any act or failure to act by an employee of a facility rendering care or treatment which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to a[n] individual with mental illness...." 42 U.S.C. §§ 10801 and 10802(1). Additionally, I agree that the Mental Health Bill of Rights speaks of affording mental health patients protection from harm. *See* 42 U.S.C. § 9501(1)(G) (stating that patients should be guaranteed the "right to a humane treatment environment that affords reasonable protection from harm...."). Finally, I accept the Hospital's contention that, in *Allen v. Montgomery Hospital,* 548 Pa. 299, 696 A.2d 1175, 1179 (1997), the Pennsylvania Supreme Court characterized the Mental Health Procedures Act, 50 P.S. § 7101 *et seq.,* as constituting "a clear public policy by the General Assembly to make adequate treatment available to mentally ill patients," and defined treatment, "to include the prevention or alleviation of both physical and mental illness."

The Hospital further urges that I have already recognized the existence of such a public policy. In *Highlands Hospital and Health Center v. American Federation of State, County and Municipal Employees,* 1996 WL 163947 at * 4 (W.D.Pa. Feb.16, 1996), I held that the various statutes referenced above supported "a well defined and dominant public policy that seeks to protect patients from being subject to physical abuse by caregivers." In *Highlands,* the caregiver had not simply neglected a patient, but rather had physically assaulted a patient.

The Hospital argues that, for purposes of the existence of a public policy, the distinctions between *Highlands,* where a caregiver assaulted a patient, and this case, where a caregiver failed to monitor a patient who threatened to harm herself, are not meaningful. I agree. The apparent goal of each piece of legislation is to provide protection to mentally ill patients from harm. That harm may come from different sources—a caregiver, a fellow patient, or the patient himself—is not vital. Here, the Hospital charges that Simko created the potential for the patient to harm herself. The statutes seek to avoid that result.

The fact that civil liability may exist for negligent failure to provide adequate care and supervision to a psychiatric patient who committed suicide, *see Simmons v. St. Clair Memorial Hospital,* 332 Pa.Super. 444, 481 A.2d 870 (1984), convinces me that the public policy at issue is broader than the factual circumstances present in *Highlands.* Simply stated, I find a well defined public policy exists which seeks to prevent harm from being inflicted, from whatever source, upon psychiatric patients.[2]

### (B). *The Arbitrator's Award*

My next task is to determine whether the arbitrator's award violates public policy. The Hospital insists that it does. The arbitrator found that on two separate occasions, Simko left the patient in his charge, "for perhaps as long as fifteen minutes the first time, and between five and ten minutes the second time in clear violation of the Hospital's ... observation policy." *See* Arbitrator's Decision, p. 18. The arbitrator also found that Simko was more than 35 feet away from his patient, for anywhere from five to fifteen minutes, on another occasion. *See* Arbitrator's Decision, p. 19. Each incident occurred on the same day. Having found that Simko placed his patient's safety in jeopardy, the Hospital apparently reasons, the arbitrator's refusal to uphold his discharge contravenes public policy.

■ I disagree. Following the Hospital's logic, the public policy exception would, in actuality, require the following two-prong test: (1) does a well-defined public policy exist; and (2) did the *employee* act in contravention of that policy. If the employee did act in such a manner, the Hospital would insist, then any decision by an arbitrator short of discharge would violate public policy. Yet, as stated above, the second inquiry in the public policy analysis is whether the *arbitrator's* award violates public policy. Thus, a finding that an employee acted in conflict with a public policy regarding safety does not compel a finding that discharge is the only appropriate discipline. *See United Transp. Union Local 1589 v. Suburban Transit Corp.,* 51 F.3d 376, 382 (3d Cir.1995) (stating that, even if the employee had violated a public policy regarding safety, an arbitrator's reinstatement of the employee was appropriate).

Thus, the Hospital must prove more than that an employee simply violated a public policy. It must prove that the arbitrator's opinion undermined or conflicted with public policy. This, I find, the Hospital cannot do. The Hospital's rather cursory argument in this regard consists mainly of assertions that the factual circumstances here are analogous to those present in *Highlands* and *Russell Memorial Hospital Assoc. v. United Steelworkers of America,* 720 F.Supp. 583 (E.D.Mich.1989), where district courts vacated arbitrators' awards ordering reinstatement. Significant factual distinctions exist between *Highlands* and the case at bar. In *Highlands,* the caregiver assaulted a patient in her charge. Here, Simko was guilty of neglect. Certainly harm could have befallen his patient. Yet I find the difference between actual infliction of harm by a caregiver and neglect by a caregiver to be important. Additionally, on two of the occasions during which Simko left the patient, a student was present. While the student was not autho-

---

2. In the Union's initial brief, it did not discuss whether or not a well-defined public policy existed. Accordingly, I ordered the Union to address this issue. *See* Docket No. 12. In its ensuing Reply, the Union again asserted that the arbitra-

tor's decision does not violate public policy, but made no mention of whether or not such a policy exists. I therefore consider the Union's silence in this regard to constitute a tacit admission that such a policy does, in fact, exist.

rized to be left alone with the patient, she could have called for Simko's help.

I also find important the fact that, in *Highlands,* assaulting a patient constituted a clear violation of the Hospital's policies. Here, the arbitrator found that testimony established an inconsistency in the Hospital's interpretation of the phrase "arm's length," and a lack of enforcement of the rule. It is undisputed that Simko had never previously been alerted that his interpretation of the "constant observation" and "arm's length" rules was inappropriate.

Moreover, unlike the caregiver in *Russell,* who was found to have a propensity for misconduct and to be reluctant to change her ways, here the Hospital proffered no such evidence. Indeed, representatives of the Hospital testified that Simko was a "competent" caregiver and had many years of experience. *See* Arbitrator's decision, p. 4. There was simply no evidence indicating that Simko would refuse to act in a manner consistent with the newly clarified "arm's length" policy.

Finally, I find important, as did the arbitrator, the fact that the Hospital's discharge of Simko was based primarily upon its finding that he was carrying a "dangerous weapon." *See* Arbitrator's decision, p. 16 (stating that, "[t]he record establishes that Management believed the most serious of the charges levied against the Grievant was his possession of a deadly weapon, i.e., the pocketknife, while on duty, and his using it to cut the string off of the nightgown of a suicidal patient who was obsessing about it."). The arbitrator found the Hospital's conclusion in this regard to be erroneous, and, significantly, the Hospital does not dispute the arbitrator's decision in this regard. Thus I am faced, as was the arbitrator, with a situation where the most serious of the charges supporting Simko's termination was found to be without merit.

In such an instance, I cannot conclude that the arbitrator's decision violated public policy. Clearly he was concerned with safety of psychiatric patients. A three month suspension, without pay, is reflective of such concern. I reject any contention that reinstatement of a "competent" employee with many

years of experience, without any prior reprimands, who neglected a patient by violating a not-clearly defined "arm's length" observation requirement, undermines public policy designed to safeguard psychiatric patients. Instead, I believe that, here, "the arbitrator had an eye toward public safety when he rendered his decision." *United Transp.,* 51 F.3d at 382. Accordingly, the Hospital's public policy argument fails to persuade me that the arbitrator's decision must be vacated.

### (C). *Sanctions*

■ While I agree with the Union that the arbitrator's decision should not be vacated on the grounds of public policy, I decline to impose sanctions. The Union urges, in support of its request, that "[t]he Award represents a rational interpretation of the contract language at issue and specifically resolved the issue presented to him." *See* Docket No. 4, p. 20; *see also,* p. 21 (stating that the Hospital "cannot sincerely or seriously argue that the Award is irrational and wholly unsupported by principles of contract construction."). Thus, the request for sanctions is based upon the contention that any challenge by the Hospital that the decision did not "draw its essence" or is not "rationally related" to the collective bargaining agreement, would be frivolous. Yet, as stated above, the Hospital makes no such assertion. The request for a vacation of the arbitrator's award is, instead, based upon the assertion that the award violates public policy. Accordingly, I find the Union's request to be moot.

### ORDER OF COURT

**AND NOW,** this **22nd** day of October, 1998, for the reasons set forth in the accompanying Opinion, the Defendant's Motion for Summary Judgment (Docket No. 3) is granted in part and denied in part. It is **ORDERED** that the Motion is **GRANTED** insofar as the Arbitration Award of Louis V. Imundo, Jr. is **CONFIRMED** and **ENFORCED.** It is further **ORDERED** that the Hospital is **DIRECTED** to immediately comply with the express terms of the Arbitration Award.

The Motion is **DENIED,** however, insofar as it sought the imposition of sanctions. The Clerk of Courts is hereby directed to mark this case "Closed" *forthwith.*