**BOSTON MEDICAL CENTER,**
Plaintiff,

v.

**SERVICE EMPLOYEES INTER-NATIONAL UNION, Local 285, Defendant.**

No. CIV. A. 99–11663–WGY.

United States District Court,
D. Massachusetts.

Sept. 18, 2000.

Arthur P. Menard, Robert S. Steinberg, Menard, Murphy & Walsh, Boston, MA, for Plaintiff.

David B. Rome, Pyle, Rome & Lichten, P.C., Boston, MA, for Defendant.

### MEMORANDUM AND ORDER

WILLIAM G. YOUNG, Chief Judge.

### I. INTRODUCTION

Pursuant to Section 301 of the Labor Relations Act, 29 U.S.C. § 185, the plaintiff, Boston Medical Center (the "Hospital"), seeks to vacate an arbitration award in favor of the defendant, Service Employees International Union, Local 285 (the "Union"). In response, the Union defends the award. At this stage, both parties move for summary judgment, and the defendant also moves for attorney's fees.

### II. BACKGROUND

As it must, this Court accepts the arbitrator's findings of fact. *See United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). The following recitation of facts, therefore, is consistent with the arbitrator's findings.

The Hospital and the Union entered into a collective bargaining agreement that was effective from October 1, 1997 through September 30, 1999, which provided for the arbitration of disputes. *See* Pl.'s Statement of Material Facts Ex. A [hereinafter "Agreement"]. Article XV of the

Agreement prohibits discipline or discharge of employees except for "just cause." *See id.* at 27. The Management Rights Article guarantees the Hospital the exclusive right to "suspend, discipline, and discharge employees for just cause." *Id.*

The Hospital discharged Katherine Hartney ("Hartney"), a ten-year registered nurse, based on her care of a burn patient ("the baby"). The baby was a four-month-old infant admitted to the Hospital on September 22, 1998, with second degree burns on her feet, legs, and buttocks resulting from a bath accident. *See* Pl.'s Mem. Ex. A, *Service Employees Int'l Union, Local 285 v. Boston Medical Center,* AAA No. 113900219898 (1999) (Waxman, Arb.) [hereinafter "Arb. Report"]. On September 25, 1998, the baby was still in the Hospital and Hartney was assigned as her primary care nurse. *See id.* at 3.

Because of her extensive burns, the baby was being monitored for the possible onset of a condition called septic shock or sepsis. *See id.* at 8. Sepsis is a potentially life-threatening condition. There are three stages of sepsis and, if it is not detected quickly, the condition can be fatal, particularly for an infant. *See id.* It is undisputed that any competent nurse would be familiar with this condition. *See id.* The first stage of sepsis is marked by elevated temperature and elevated heart and respiration rates. The second stage is marked by a reduced or normal temperature and continued elevated heart rate. The third stage is marked by a reduced temperature, elevated heart rate, and respiratory distress. When a patient enters the third stage of sepsis, he or she will commonly appear to be dusky or mottled in coloring, which signals a multi-system organ failure. The change in coloring, even without other symptoms, signifies a medical emergency and requires immediate intervention.

At the beginning of her shift, 7:00 p.m., Hartney reviewed the baby's records, which stated that the nursing staff was required to notify doctors in the event that the baby's temperature exceeded 101.5°.

The records showed that the baby's temperature had been taken at 6:10 p.m. and was 101.4°, and that she was experiencing an elevated heart rate. At 7:50 p.m., a student nurse, Melinda Leight, took the baby's temperature, determining that the baby had a temperature of 102.2°. Leight notified Hartney of the baby's temperature and Hartney instructed her to take the temperature again in an hour. Leight took the baby's temperature at 9:00 p.m. and obtained a reading of 99.3°. *See* Arb. Report at 8. At 9:30 p.m., Michelle Force, another registered nurse who was working the same shift as Hartney, reset the baby's IV tube and obtained a temperature reading at 97.0°. *See id.* She also noticed that the baby's respiratory rate was in the 60's and that her heart rate was above 200. *See id.* Force notified Hartney, reporting this data. At 11:30 p.m., Force was asked by Hartney to examine the baby's IV tube again. *See id.* at 7. Force noticed that the baby's IV tube was infiltrated and she appeared to be dusky and slightly mottled. Force reported these conditions to Hartney, who appeared quite concerned and paged a pediatric surgeon. *See id.* The baby died of sepsis not long thereafter.

The arbitrator first confronted the issue whether the Hospital had "just cause" to discharge Hartney after it investigated the circumstances of the baby's death. The arbitrator concluded that there was just cause for the imposition of discipline in this matter but that discharge was too harsh a penalty for an employee with an unblemished record of employment for nearly ten years. *See id.* at 11–12.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues as to any material fact and the moving party is entitled to judgment as matter of law. *See* Fed.R.Civ.P. 56(c). Absent a genuine dispute of material fact, questions of law are appropriate for resolution on summary judgment. *See North Adams Reg'l Hosp. v. Massachusetts Nurses Ass'n,* 889

F.Supp. 507, 511 (D.Mass.1995) (Ponsor, J.).

 Generally, courts are not authorized to reconsider the merits of an arbitration award, as that would undermine the federal policy of privately settling labor disputes by arbitration without governmental intervention. *See Misco*, 484 U.S. at 30, 108 S.Ct. 364. In 1983, however, the Supreme Court recognized an exception to the limited judicial review of arbitration awards, where the award violates public policy. *See W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). This public policy exception to the enforcement of arbitration awards was reaffirmed in 1987. *See Misco*, 484 U.S. at 29, 108 S.Ct. 364. This exception is quite limited in scope and an arbitrator's award will only be vacated as conflicting with public policy if the policy relied upon is "well-defined" and "dominant" and is ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. *See W.R. Grace*, 461 U.S. at 766, 103 S.Ct. 2177. In addition, the violation of such a policy must be clearly shown if an award is not to be enforced. *See Misco*, 484 U.S. at 43, 108 S.Ct. 364.

The general principles that we must apply are familiar. [R]eview of labor arbitral decisions is extremely narrow and "extraordinarily deferential." *Dorado Beach Hotel Corp. v. Union De Trabajadores De La Industria Gastronomica Local 610*, 959 F.2d 2, 3–4 (1st Cir.1992). "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *Misco*, 484 U.S. at 37–38, 108 S.Ct. 364. The arbitrator cannot, of course, ignore the contract and simply dispense "his own brand of industrial justice." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Rather, the arbitrator's decision must "draw[ ] its essence" from the agreement. *Id.* Provided that the arbitrator "is even arguably construing or applying the contract and acing within the scope of his authority," a court may not disturb his judgment even if it is "convinced he committed serious error." *Misco*, 484 U.S. at 38, 108 S.Ct. 364; *see also Advest Inc. v. McCarthy*, 914 F.2d 6, 9 (1st Cir.1990) (quoting *Misco* ). *Kraft Foods, Inc. v. Office and Professional Employees Int'l Union*, 203 F.3d 98, 100 (1st Cir.2000) (Selya, J.). The *Misco* court also noted that a reviewing court may vacate an arbitration award if it reflects nothing more than the arbitrator's own notions of industrial justice. *See Misco*, 484 U.S. at 38, 108 S.Ct. 364.

## IV. *DISCUSSION*

The parties rigorously dispute (1) the public policy concerns regarding whether Hartney may retain her position at Boston Medical Center as well as (2) the scope of the arbitrator's authority to resolve certain issues. The Court addresses these matters in reverse order.

### A. The Authority of the Arbitrator

The terms of the collective bargaining agreement which are most germane to this case are Articles XV and XVI. Article XV states that "[n]o RN who has completed his/her probationary period shall be disciplined or discharged except for just cause." Agreement at 27. Article XVI states that "the Hospital retains the exclusive right to ... suspend, discipline and discharge employees for just cause." *Id.*

As long as the arbitrator's award " 'draws its essence' from the contract and is based upon a 'passably plausible' interpretation of the contract, it is within the arbitrator's authority." *State v. National Ass'n of Gov't Employees Local No. 79*, 544 A.2d 117, 119 (R.I.1988); *see also Crafts Precision Indus., Inc. v. Lodge No. 1836 of Dist. 38*, 889 F.2d 1184, 1185 (1st

Cir.1989) (several "plausible arguments" were found to support arbitrator's determination that there was not "just cause" for discharge).

The record here indicates that the arbitrator was asked these questions: 1) Did the Hospital violate Article XV of the collective bargaining agreement when it terminated Hartney?; and 2) If so, what shall be the remedy? *See* Arb. Report at 1. Here, contrary to the situation in *Crafts Precision*, the arbitrator actually determined that there was "just cause" to discipline Hartney, but then reduced her penalty from discharge to a lengthy suspension. *See id.* at 17. The arbitrator rejected Hartney's proffered reasons as to why she thought that the student nurse's temperature reading of 102.2˜was inaccurate, and acknowledged that Hartney engaged in more than one substandard nursing practice while monitoring the baby on the night of her death. *See id.* at 13–14. Even so, relying on Hartney's virtually unblemished past employment history, the arbitrator reduced the sanction. *See id.* at 17–18. By lessening Hartney's penalty, the arbitrator contradicted her own findings. *See Edgewood Convalescent Center v. New England Health Care Employees*, No. 84–2457–N, 1985 WL 5779, at *2 (D.Mass. 1985) (Alexander, M.J.).

Article XVI of the agreement expressly provides that the Hospital is empowered to discharge employees for just cause. *See* Agreement at 27. Upon the determination that just cause for discipline existed, Article XVI vested the power to "sentence" in the Hospital alone, *see id.*, and any further determination by the arbitrator necessarily modifies the existing agreement between the parties. *See Nat'l Ass'n*, 544 A.2d at 119. The arbitrator is not allowed to modify the collective bargaining agreement to apply her own brand of industrial justice. *See Misco*, 484 U.S. at 38, 108 S.Ct. 364. There is here simply no way plausibly to read Articles XV and XVI together in such a manner as to limit the Hospital's managerial rights once just cause has been found. Nor on this record is there any indication that the parties' own conduct in implementing and working within the collective bargaining agreement had modified the Hospital's managerial rights.

### B. Public Policy

Wholly apart from the collective bargaining agreement, the Commonwealth of Massachusetts has a well-established public policy ensuring that hospital patients receive proper health care. "The practice of nursing shall mean the performance ... of those services which assist individuals ... to maintain or attain optimal health .... Each individual licensed to practice nursing in the commonwealth shall be directly accountable for safety of nursing care he delivers." Mass. Gen. Laws ch. 112, § 80B. One of the many state regulations on standards of nursing care provides that "[a] licensed nurse with responsibility for direct patient care shall systematically collect, verify and organize information about a patient, evaluate the significance of the findings, accurately and adequately record the information to the appropriate person(s), and take appropriate nursing interventions as necessary for the patient's well-being." 244 C.M.R. 2.3(14). Compliance with the regulations on nursing care alone, even in the absence of the many statutes of the Commonwealth promoting patient health and safety, constitutes public policy. *See Borden, Inc. v. Commissioner of Public Health*, 388 Mass. 707, 721, 448 N.E.2d 367 (1983) ("A regulation is essentially an expression of public policy."). In addition, the United States District Court for the District of Massachusetts has held that Massachusetts regulations establish a public policy that registered nurses be competent. *See Brigham & Women's Hosp. v. Massachusetts Nurses Ass'n*, 684 F.Supp. 1120, 1125 (D.Mass.1988) (Caffrey, J.).

The concern for patient safety and interest in promoting safe and optimal health care are issues of national concern and emergent national policy as well. As re-

cently as November 30, 1999, the Institute of Medicine of the National Academy of Science reported that in hospitals alone at least 44,000 to 98,000 people a year die due to medical errors. *See* Linda Kohn et al. eds., Institute of Medicine, To Err Is Human: Building a Safer Health System 1 (1999). "These stunningly high rates of medical errors—resulting in deaths, permanent disability and unnecessary suffering—are simply unacceptable in a medical system that promises first to 'do no harm.'" Robert Pear, *Group Asking U.S. for New Vigilance in Patient Safety*, The New York Times, Nov. 30, 1999, at A1. "To err is human, but errors can be prevented." Kohn, *supra*, at 4. In response to these concerns, in December 1999, President Clinton ordered federal agencies to take urgently needed steps to improve patient safety. *See* President's Remarks on Improving Health Care Quality, 35 Weekly Comp. Pres. Doc. 2527 (Dec. 7, 1999); *see also A Plan to Reduce Medical Errors*, St. Petersburg Times, Dec. 14, 1999.

 Many courts have vacated arbitration awards on the basis that they violate public policy in cases where health and safety are at issue. *See Iowa Elec. Light and Power Co. v. Local 204*, 834 F.2d 1424 (8th Cir.1987) (vacating reinstatement of employee who defied safety regulation at nuclear plant); *Edgewood Convalescent*, 1985 WL 5779 at *2 (vacating reinstatement of nurses who were discharged for "gross negligence" and "complete disregard for patient care"); *Russell Mem'l Hosp. Ass'n v. United Steelworkers of America, Inc.*, 720 F.Supp. 583, 586 (E.D.Mich.1989) (vacating reinstatement of licensed practical nurse who was discharged for negligence in administering medication). On this rare occasion, the Court does the same. More precisely, this Court determines that the Massachusetts statutory provisions, legal precedent, and substantial national concern for the safety of patients, taken together, reflect the type of well-defined and dominant public policy that can properly form the basis for set-

ting aside an arbitration award as permitted by *W.R. Grace* and *Misco*. The facts of this case compel the conclusion that reinstatement of Katherine Hartney would violate the public policy, prominent in legal precedent and the laws, of ensuring that patients receive optimal health care.

Here, the arbitrator concluded that on the night of the baby's death, Hartney engaged in "serious substandard nursing practices" contributing to—or at least failing to prevent—that tragic event. The arbitrator concluded that Hartney either did not see the doctor's note or else disregarded the order entirely, and her failure to notify the doctor when she obtained a temperature reading of 102.2 constituted a substandard nursing practice. At another point in the evening, Hartney was informed that the baby's respiratory rate was in the 60's, her pulse was above 200, and her temperature was 97.0, and again Hartney failed to notify the doctor. The arbitrator concluded that those vital signs were abnormal, should have been reported to a physician, and that failure to do so constituted a serious substandard nursing practice. Nonetheless, the arbitrator concluded that this evidence does not depict a person who callously disregarded the welfare of her patient, and this Court acknowledges that it may not alter that conclusion.

In *Russell Mem'l Hosp. Assoc. v. United States Steelworkers of America*, 720 F.Supp. 583, 587 (E.D.Mich.1989), the court indicated that reinstatement of an employee who had failed to obey orders, left the work area without informing her supervisor, and failed to administer medication to a patient would be "akin to that of the alcohol-drinking airline pilot [*Delta Air Lines, Inc. v. Air Line Pilots Ass'n*, 861 F.2d 665, 671–72 (11th Cir.1988) ], the 'reckless' auto mechanic [*Stead Motors v. Automotive Machinists Lodge No. 1173*, 843 F.2d 357, 359 (9th Cir.1988) ], and the 'thoughtless' nuclear power plant operator [*Iowa Elec.*, 834 F.2d at 1428–29]," all cases which resulted in the discharge of

the employee. The conduct of the nurse in *Russell* was not willful; it was negligent. The nurse's behavior did not result in the death of a patient, and still she was discharged. Prior to the few times that she did not obey orders, that nurse had an unblemished record. The Court ordered the discharge of that nurse, as reinstatement of the nurse would violate Michigan's established public policy in favor of ensuring the delivery of safe and competent nursing care. *See Russell,* 720 F.Supp. at 587. True, courts have been reluctant to uphold the discharge of employees even if they have had more than one prior incident of misconduct. *See Brigham & Women's Hosp.,* 684 F.Supp. at 1125 (five disciplinary incidents did not render nurse, with otherwise excellent work record, incompetent, and therefore did not violate public policy). In *Brigham & Women's Hospital,* a registered nurse was reinstated after five incidents of misconduct, including being rude to co-workers in the presence of patients, contradicting the orders of her supervisor, and in one instance failing to consult proper personnel. *See id.* On this latter occasion, her behavior resembled that of Hartney when she failed to notify the doctor when a patient's blood pressure rose considerably within a three-hour period. The court in *Brigham & Women's Hospital* held that these incidents did not render the nurse incompetent, and therefore there was no violation of public policy. *See id.* Contrary to the instant case, however, in *Brigham & Women's Hospital,* there was no evidence that the nurse was instructed to notify a doctor under any particular circumstances.

This Court adopts the reasoning in *Russell* and determines that, in the instant case, the "substandard nursing practices" acknowledged by the arbitrator resemble the type of behavior described in *Russell* which detrimentally impacts the patient and violates the well-established public policy of delivering safe and competent nursing care. Although Hartney had no prior record of misconduct, her conduct on that one night rises to a level of error more severe than the result of the conduct in *Brigham & Women's Hospital.*

There is one other matter which this Court must acknowledge is not extraneous to its decision. The baby died—she died, so the arbitrator found, due to the acts or omissions of Katherine Hartney. This Court has found no case where reinstatement has been ordered against a public policy argument after a preventable death.

There are sound reasons for such a result. If the recognized policy favoring optimal health care is to have practical meaning, an otherwise preventable death occasioned by negligence simply must warrant the most severe employment penalty—discharge. True, such justice is rough justice at best. Not every captain who loses his ship, doctor who loses her patient, or lawyer who loses a case ought thereafter be beached. Yet, where negligence causes tragedy, the public needs to have confidence that there will be no individual repetition. As viscerally unfair as this may be to the nurse whose professional career crumbles on one terrible night where her conduct was, perhaps, no worse than that of similarly situated professionals who do not lose their patients, the draconian employment sanction can be, and must be, justified on the ground that, without it, the public health policy is perceived as exhortation only with a consequent diminution in the willingness to seek health care at that hospital, diversion of needed patient care funds to the increase in insurance costs due to carrying such a nurse on the payroll and, ultimately, a relaxation of standards (whatever the rhetoric) in those health care organizations where negligence will not cost you your job.

It is appropriate to recognize that the arbitrator does not have the authority to consider these public policy issues. *See Chrysler Motors Corp. v. International Union,* 748 F.Supp. 1352, 1359 (E.D.Wis. 1990). She was limited to interpreting the issues arising within the scope of the col-

lective bargaining agreement. Public policy questions are reserved for this Court, and it is within this Court's power to vacate or confirm arbitration awards based on such policies. Given the opportunity to reflect upon the overwhelming public policy requiring the delivery of safe and optimal health care manifest in state law and legal precedent, this Court determines that Hartney's conduct on the night of the baby's death differs from any case where conduct did not result in death, and directly conflicts with Massachusetts' public policy. Allowing Hartney a second chance after such behavior would seriously undermine the public policy of this state and of the nation.

## V. CONCLUSION

For all the foregoing reasons, this Court takes the unusual but, on this record, necessary action and vacates the arbitrator's award. The Hospital may discharge Katherine Hartney. The Union's request for attorney's fees is denied.