# United States Court of Appeals
## For the First Circuit

No. 00-2322

BOSTON MEDICAL CENTER,

Plaintiff, Appellee,

v.

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 285,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, Chief U.S. District Judge]

Before

Boudin, Chief Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

Robert S. Steinberg, with whom Arthur P. Menard and Menard, Murphy & Walsh LLP were on brief, for appellee.
David B. Rome, with whom Pyle, Rome, Lichten & Ehrenberg, P.C. was on brief, for appellant.

August 9, 2001

**LIPEZ, Circuit Judge**. Service Employees International Union, Local 285 ("the Union") appeals the entry of summary judgment in favor of Boston Medical Center ("BMC" or "the Hospital") vacating an arbitrator's award ordering the reinstatement of Katherine Hartney, a registered nurse employed by BMC but terminated following the death of an infant under her care. The district court found that the arbitrator had exceeded the scope of her authority under the collective bargaining agreement between the Union and BMC in ordering Hartney's reinstatement. Additionally, the court ruled that the arbitrator's award was unenforceable because it violates "the well-established public policy [in Massachusetts] of delivering safe and competent nursing care." Boston Med. Ctr. v. Service Employees Int'l Union, Local 285, 113 F. Supp.2d 169, 174 (D. Mass. 2000). We reverse.

**I.**

We accept the facts as the arbitrator found them. See El Dorado Technical Servs., Inc. v. Union General de Trabajadores de Puerto Rico, 961 F.2d 317, 320 (1st Cir. 1992). A four-month-old infant, Baby X,[1] was admitted to BMC on

---

[1] The infant was referred to as "Baby X" during the arbitration and in the arbitrator's report.

September 22, 1998 for second degree burns on her legs, feet, and buttocks resulting from a bathing incident involving hot tap water. Hartney, who had been employed by BMC for ten years, reported for her nursing shift beginning at 7 p.m. on September 24. Hartney was the baby's primary care nurse from 7 p.m. to 7 a.m. on September 25. When she arrived for her shift, Hartney was briefed by the outgoing nurses on the status of the patients under her care. This meeting lasted approximately thirty to forty minutes.

During the night of September 24, Baby X was being monitored for sepsis or septic shock, a condition familiar to any competent nurse. The potentially fatal condition, particularly for infants, is characterized by three clinical stages. The first stage is marked by an increase in the patient's temperature, respiration, and heart rate; the second stage is marked by a normal or reduced temperature and an elevated heart rate; and the third stage is marked by a reduced temperature, increased heart rate, and respiratory distress. Patients in the third stage of septic shock may also appear mottled or dusky in coloring.

At 7:50 p.m., student nurse Melinda Leight took Baby X's temperature using a glass thermometer and obtained a reading of 102.2. Hartney waited outside Baby X's room during this time

and reviewed her paperwork from the previous day. This paperwork included an order by the baby's doctor for nursing personnel to notify a doctor if her temperature exceeded 101.5. Hartney testified that she did not contact a doctor at that time, however, because her own clinical assessment of Baby X led her to believe that the temperature reading of 102.2 was inaccurate.

There was conflicting testimony offered about Hartney's clinical decisions and patient care after that point. Hartney testified that she instructed Leight to recheck the baby's temperature with an electronic thermometer in ten minutes, at 8 p.m., and that the reading at that time was 99.3. However, Leight testified that Hartney instructed her to take a temperature reading again in one hour, at 9 p.m., at which time she obtained a reading of 99.3. The arbitrator credited Leight's account of these events.

Between 8 p.m. and 11 p.m., Hartney performed a variety of routine care-taking tasks for Baby X, including changing her diaper, changing her burn dressings, and monitoring her intravenous line. While the infant's heart rate was elevated during this time, Hartney testified that she was not unduly concerned because she attributed the elevated heart rate to

burn-related pain, and because she believed the baby's heart rate had been elevated during the previous shift as well.

The arbitrator heard conflicting testimony from Hartney and another nurse on duty that night, Michelle Force. Force stated that she entered Baby X's room at 9:30 p.m. and obtained the following readings: a temperature of 97.0, a pulse above 200, and respiration in the 60s. Force testified that she discussed these findings with Hartney. Hartney, on the other hand, stated that Force did not enter Baby X's room until 11:30 p.m. The arbitrator credited Force's account that she checked on Baby X at 9:30 p.m. and reported to Hartney.

In another discrepancy in the accounts that Hartney and Force gave of the events that night, Force testified that she observed changes in Baby X's skin coloring when she and Hartney checked on the infant together at 11:30 p.m. However, the arbitrator credited Hartney's testimony that the baby's skin appeared normal at 11:30 p.m. and that she did not observe any discoloration until 12:15 a.m. The arbitrator found that Hartney acted promptly at 12:15 a.m. when she observed Baby X's mottled lips, recognized entry into the third stage of septic shock, and called a pediatric surgeon. The arbitrator concluded that there was no reason to suspect Hartney would not have acted promptly had she noticed unusual coloring at 11:30 p.m.

-5-

Baby X deteriorated through the remainder of the night and died at 4:55 a.m. on the morning of September 25, 1998. The Hospital conducted an investigation of the circumstances of Baby X's death. Two nursing supervisors questioned Hartney, Leight, and Force and reviewed the infant's patient records. Based on their determination that Hartney "engaged in serious substandard nursing practices" in caring for Baby X, BMC terminated Hartney on October 2, 1998.

After the Union submitted to arbitration a grievance concerning Hartney's discharge, the arbitrator heard two days of testimony. On July 6, 1999, the arbitrator issued an Opinion and Award finding that BMC violated Article XV of the collective bargaining agreement in discharging Hartney without just cause, and reduced the penalty imposed by BMC from discharge to an unpaid, nine-month suspension.

BMC brought an action in the district court to vacate the arbitrator's award. See 29 U.S.C. § 185. The Union counterclaimed for enforcement. BMC advanced two arguments before the district court: 1) that the arbitrator exceeded her authority in reducing the penalty chosen by BMC despite her finding that BMC had just cause to impose some level of discipline on Hartney; and 2) that the award was unenforceable because it violated public policy in Massachusetts in favor of

safe and competent nursing care.  The district court vacated the award on both grounds.  Persuaded that these rulings are erroneous, we vacate the judgment of the district court and order entry of judgment for the Union on its counterclaim for confirmation of the arbitrator's award.

## II. Interpretation of the Collective Bargaining Agreement

The parties agreed to the following issues before the arbitrator: "(1) Did the Hospital violate Article XV of the collective bargaining agreement when it terminated the grievant, Katherine Hartney, on October 2, 1998?; [and] (2) If so, what shall be the remedy?"  Article XV of the collective bargaining agreement provides: "No RN who has completed his/her probationary period[2] shall be disciplined or discharged except for just cause."  In her written decision, the arbitrator concluded that "there is just cause for the imposition of discipline in this matter but . . . discharge is too harsh a penalty for an employee with an unblemished record of employment for nearly ten years."  In considering the appropriate penalty, the arbitrator rejected BMC's position that the collective

---

[2] Article IV of the agreement provides that up to 120 calendar days for a newly hired or rehired RN are considered a probationary period, during which time the provisions of the agreement regarding grievance procedures do not apply to the discipline or discharge of the RN.  Hartney had worked at the hospital for ten years as a registered nurse at the time of the incident involving Baby X.

bargaining agreement precluded the application of progressive discipline: "While [Article XV] makes no explicit reference to progressive discipline, it references 'just cause,' a concept which encompasses both liability for the action(s) charged and fairness in the amount of discipline imposed." The arbitrator ordered that the Hospital reinstate Hartney immediately, but without back pay,[3] and ordered Hartney to participate in a remedial educational program for the treatment of pediatric burn victims as part of the reinstatement process.

In considering BMC's motion for summary judgment, the district court interpreted Article XV of the agreement in conjunction with Article XVI. Article XVI, entitled "Management Rights," provides in part: "Except to the extent expressly limited by this Agreement, the Hospital retains the exclusive right to . . . suspend, discipline and discharge employees for just cause." The district court interpreted these provisions as follows:

> Upon the determination that just cause for discipline existed, Article XVI vested the power to "sentence" in the Hospital alone, and any further determination by the arbitrator necessarily modifies the existing agreement between the parties. . . . There

---

[3] By July 6, 1999, when the arbitrator rendered her decision, Hartney had been suspended for just over nine months. Thus, the arbitrator's award amounted to a nine-month suspension without pay.

>is here simply no way plausibly to read Articles XV and XVI together in such a manner as to limit the Hospital's managerial rights once just cause has been found.

Boston Med. Ctr., 113 F. Supp.2d at 172 (citations omitted). Because the arbitrator found that just cause existed for disciplining Hartney, yet concluded that discharge was inappropriately harsh, the district court concluded that "the arbitrator contradicted her own findings." Id. We review the district court's decision de novo. See Keebler Co. v. Truck Drivers, Local 170, 247 F.3d 8, 11 (1st Cir. 2001).

As the Union correctly notes, the Hospital never argued before the arbitrator that Article XVI limited her authority to decide whether Hartney was discharged for just cause. The Union argues that the Hospital's failure to raise Article XVI in the arbitration proceedings precluded the district court from considering that provision in reviewing the arbitrator's award. Because we find that the district court's interpretation of Article XVI was erroneous, we need not reach the question of whether the Hospital waived that argument.

An arbitrator's interpretation of a collective bargaining agreement "must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987). Nonetheless, because the parties

to a collective bargaining agreement "have bargained for the arbitrator's construction of their agreement," the arbitrator's interpretation is entitled to great deference by the courts. Eastern Associated Coal Corp. v. United Mine Workers of Amer., 531 U.S. 57, 62 (2000) (internal quotation marks omitted). We set aside an arbitrator's interpretation only in rare instances. See id. "After all, 'the federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of [arbitral] awards.'" El Dorado Technical Servs., 961 F.2d at 319 (quoting United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596 (1960)). We find that the arbitrator's interpretation of the agreement in this case was a reasonable interpretation of the agreement between BMC and the Union.[4]

The plain language of Article XV, requiring just cause before an RN is disciplined or discharged, contemplates a range

---

[4] Even if we concluded that the arbitrator's interpretation of the agreement was erroneous, that finding would not, by itself, be enough to overturn the award. See Misco, 484 U.S. at 38 ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."). We have upheld arbitrator's awards even where we expressed doubt about the arbitrator's rationale. See, e.g., Keebler, 247 F.3d at 11 ("We share the district court's skepticism about the merits of the arbitrator's rationale. . . . Even so, such skepticism is not enough to vacate the arbitrator's decision."). This is not such a case.

of disciplinary responses.  As the arbitrator properly found, the concept of just cause requires a close relationship between the employee's conduct and the Hospital's response along that disciplinary range.  By its terms, Article XVI is subject to other provisions in the agreement, including the just cause provision in Article XV.  Yet the Hospital urges us to interpret Article XVI as the district court did to find that the Hospital has unlimited rights to discipline or discharge an employee once just cause has been found.  Under the Hospital's reading of these provisions, even the most minor disciplinary offense would give the Hospital an unfettered right to discharge the offending employee.  This is not a sensible interpretation of Article XV. The arbitrator was free to conclude that there was no just cause for discharging Hartney, but that there was just cause for a lesser discipline.  See, e.g., Keebler, 247 F.3d at 13 ("Thus, in substance, the arbitrator found some degree of insubordination, but not the sort of gross insubordination sufficient to constitute just cause for immediate termination."); Crafts Precision Indus., Inc. v. Lodge No. 1836, 889 F.2d 1184, 1185 (1st Cir. 1989) (affirming arbitrator's decision to reduce the sanction for an employee's violation of a company rule from discharge to suspension without pay because there was no just cause for discharge).

The arbitrator's reading of the just cause provision to include a concept of progressive discipline is supported in our previous decisions. For example, in Exxon Corp. v. Esso Workers' Union, 118 F.3d 841 (1st Cir. 1997), abrogated on other grounds, Eastern Associated Coal Corp., 531 U.S. 57, we upheld an award where the arbitrator concluded that the employer's right to discharge an employee under the agreement was subject to a consideration of just discipline. In that case, the collective bargaining agreement provided that Exxon "may discharge or otherwise discipline" employees who committed posted offenses. Exxon Corp., 118 F.3d at 845. A separate provision allowed employees to challenge discharges Exxon had imposed without just cause. See id. Noting those two provisions of the collective bargaining agreement, we stated: "[The arbitrator] concluded that the language which permits Exxon 'to discharge or otherwise discipline' an employee who commits a posted offense furnishes Exxon with a range of disciplinary options, and that this range is in turn subject to an independent application of the just cause barometer." Id. The arbitrator in Exxon Corp. thus ruled that the just cause standard required Exxon to prove "that the level of discipline was warranted," id. at 845 n.2, and we upheld that interpretation. See id. at 845. Other circuits have upheld

-12-

similar interpretations of collective bargaining agreements where an arbitrator concluded that a concept of progressive discipline was contemplated by a provision requiring a finding of just cause before an employee is discharged. <u>See, e.g.</u>, <u>Local No. 7 Union Food & Commercial Workers Int'l Union</u> v. <u>King Soopers, Inc.</u>, 222 F.3d 1223, 1229 (10th Cir. 2000); <u>Westvaco Corp.</u> v. <u>United Paperworkers Int'l Union</u>, 171 F.3d 971, 975 (4th Cir. 1999); <u>Abram Landau Real Estate</u> v. <u>Benova</u>, 123 F.3d 69, 75 (2d Cir. 1997); <u>United Transp. Union Local 1589</u> v. <u>Suburban Transit Corp.</u>, 51 F.3d 376, 381 (3d Cir. 1995).[5]

### III. Public Policy Exception

The Hospital argues that even if the arbitrator had the authority pursuant to the just cause provision to decide that progressive discipline was appropriate, her specific decision to reinstate Hartney violates an established public policy providing for safe and competent nursing care. The public

---

[5] This is not a case where the collective bargaining agreement specifically provides for automatic discharge in situations where care providers like Hartney are found to be negligent. <u>See</u> <u>Keebler</u>, 247 F.3d at 14 n.2 (drawing a distinction between the facts of <u>Keebler</u> and other cases where arbitrators "unambiguously found that the grievant had committed conduct listed in his employment agreement as grounds for termination"). Two of the cases relied upon by the Hospital in its brief may be distinguished on this ground. <u>See</u> <u>Georgia-Pacific Corp.</u> v. <u>Local 27, United Paperworkers Int'l Union</u>, 864 F.2d 940 (1st Cir. 1988); <u>S.D. Warren Co.</u> v. <u>United Paperworkers' Int'l</u>, 845 F.2d 3 (1st Cir. 1988).

policy exception to the enforcement of arbitral awards finds its roots in basic contract law: "A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy." Misco, 484 U.S. at 42. However, the public policy exception is limited to instances "where the contract as interpreted [by the arbitrator] would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." Id. at 43 (internal quotation marks omitted).

Citing state nursing regulations, as well as statistics and news articles about the importance of patient safety, the district court concluded: "[T]he Commonwealth of Massachusetts has a well-established public policy ensuring that hospital patients receive proper health care." Boston Med. Ctr., 113 F. Supp.2d at 172. To be sure, Massachusetts law reflects a concern for nursing competence and patient safety. However, the question is not whether Hartney's conduct violated a public policy in favor of competent nursing care, but whether the order to reinstate her violated that policy. The Supreme Court itself

-14-

has drawn this distinction in its most recent opinion regarding the public policy exception to enforcing arbitration awards:

> And, of course, <u>the question to be answered is not whether [the employee's] drug use itself violates public policy, but whether the agreement to reinstate him does so.</u> To put the question more specifically, does a contractual agreement to reinstate [the employee] with specified conditions . . . run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?

<u>Eastern Associated Coal Corp.</u>, 531 U.S. at 62-63 (emphasis added). <u>See also</u> <u>Stead Motors of Walnut Creek</u> v. <u>Automotive Machinists Lodge No. 1173</u>, 886 F.2d 1200, 1215 (9th Cir. 1989) ("[T]he critical inquiry is not whether the underlying act for which the employee was disciplined violates public policy, but whether there is a public policy barring <u>reinstatement</u> of an individual who has committed a wrongful act."). We must determine whether Massachusetts has a public policy, ascertained by reference to positive law, that prohibits reinstating Hartney in these circumstances.

The Supreme Court's most recent explanation of the public policy exception provides a framework for this inquiry. <u>See</u> <u>Eastern Associated Coal Corp.</u>, 531 U.S. 57. In that case, the employer sought to vacate an arbitrator's award reinstating an employee who had twice tested positive for marijuana use.

-15-

The employee, who drove heavy trucking equipment on public highways, worked in a safety sensitive position and was accordingly required to submit to random drug tests pursuant to regulations promulgated by the Department of Transportation. See id. at 60. The regulations also mandated suspension for any employee found to have operated a commercial motor vehicle while under the influence of drugs and established prerequisites before such an employee could return to work. See id. at 64. After considering these regulations in detail, the Court stated that it could not "find in the [Omnibus Transportation Employee Testing] Act, the regulations, or any other law or legal precedent an 'explicit,' 'well defined,' 'dominant' public policy to which the arbitrator's decision 'runs contrary.'" Id. at 67 (quoting Misco, 484 U.S. at 43). Accordingly, the Court held that the employer could not rely on the public policy exception, and that the employee had been properly reinstated. See id.

In considering whether Massachusetts has a well-defined public policy that prohibits the reinstatement of Hartney in these circumstances, we read "the relevant statutory and regulatory provisions . . . in light of background labor law policy that favors determination of disciplinary questions through arbitration when chosen as a result of labor-management

-16-

negotiation." Eastern Associated Coal Corp., 531 U.S. at 65. The Hospital identifies a number of statutes, regulations, and cases to support its claim that Massachusetts has a public policy in favor of competent nursing care. For example, one statute requires that every nurse "shall be directly accountable for safety of nursing care he delivers," Mass. Gen. Laws ch. 112, § 80B. Another state regulation directs nurses to "take appropriate nursing interventions as necessary for the patient's well-being," 244 C.M.R. 2.3(14).[6] The Hospital cites other laws requiring nurses to be licensed by the state, see Mass. Gen. Laws ch. 112, § 74A, and criminalizing the unauthorized practice of nursing, see Mass. Gen. Laws ch. 112, § 80.

This concern for patient safety and competent nursing care in Massachusetts is also reflected in the case law. See, e.g., North Adams Reg'l Hosp. v. Mass. Nurses Ass'n, 74 F.3d 346, 348 (1st Cir. 1996) ("It was at least arguable that there is a public policy in Massachusetts to protect patients by

---

[6] The Hospital cites Borden, Inc. v. Comm'r of Public Health, 388 Mass. 707, 721 (1983), for the proposition that regulations are per se expressions of public policy. However, Borden stated only, in a discussion of regulations promulgated by administrative agencies in Massachusetts, the self-evident proposition that "[a] regulation is essentially an expression of public policy." Borden, 388 Mass. at 721. Borden did not consider whether public policy as established in such regulations would be considered sufficiently explicit and well-established to be grounds for vacating an arbitrator's award under Misco.

requiring nurses to be qualified, a policy established by the Massachusetts regulations defining the general responsibilities of a registered nurse."); Brigham & Women's Hosp. v. Mass. Nurses Ass'n, 684 F. Supp. 1120, 1125 (D. Mass. 1988) ("Here, the Hospital is arguably correct in asserting the [Massachusetts] regulations establish a public policy that RN's be competent."). As the Massachusetts statutes and regulations do, these cases express the importance of ensuring the competency of medical professionals in the Commonwealth.

While these laws, regulations, and cases reflect a concern about the quality of nursing care in the Commonwealth, they do not establish a public policy prohibiting Hartney's reinstatement with the clarity demanded by Eastern Associated Coal. The Court found specifically in that case that the reinstatement of the employee who had tested positive for drug use "violates no specific provision of any law or regulation." Eastern Associated Coal Corp. 531 U.S. at 66. Similarly, we have found no specific provision of Massachusetts law that would be violated by the arbitrator's order to reinstate Hartney. In sum, Massachusetts does not have an "explicit, well-defined, and dominant public policy, as ascertained by reference to positive

law" that prohibits Hartney's reinstatement in these circumstances. Id. at 63.[7]

Even in the absence of a specific law or regulation barring reinstatement in the circumstances of this case, we acknowledge that there might be conduct so egregious that reinstatement might threaten the general public policy promoting the competence of nurses and patient safety. See id. at 63 ("We agree, in principle, that courts' authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law."). But this is not such a case. In explaining her factual findings, the arbitrator stated:

> I find no evidence that the grievant willfully or callously[8] provided substandard

_____

[7] As the Hospital points out in its brief, opinions in other jurisdictions have refused to enforce arbitrators' awards where the award violates public policy. See, e.g., Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 861 F.2d 665, 674 (11th Cir. 1988) (vacating arbitrator's award reinstating a pilot who operated a plane while intoxicated on public policy grounds); Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Brotherhood of Elec. Workers, 834 F.2d 1424, 1427 (8th Cir. 1987) (finding that order to reinstate employee who breached protocol at a nuclear power plant violated public policy in favor of a "dominant national policy requiring strict adherence to nuclear safety rules"). The conclusions of other courts that the public policies of other states forbid the reinstatement of an employee in circumstances distinguishable from those we have before us are not persuasive in deciding the instant matter.

[8] The Hospital claims that by using the language "willfully or callously," the arbitrator effectively created a new standard

-19-

> care, as in the case of a nurse who leaves her patients in order to take a nap or a nurse who is physically abusive. The grievant was in Baby X's room attending to the infant for a significant part of her shift. Even Boston Medical Center witness Michelle Force who testified against the grievant described her attitude as one of extreme concern for her patient. . . . The deficiencies in the grievant's standard of care appear to be due to clinical misjudgments, not malice, amenable to correction through supplemental education and training.

As the arbitrator noted, BMC does not dispute that Hartney's ten-year work record was unblemished until the incident involving Baby X. Given these factual findings, there is no evidence that Hartney's continued employment as a registered nurse would threaten patient safety in violation of public policy in Massachusetts.

The precedent on the public policy exception supports this fact-specific approach to considering the consequences of reinstating an employee found to have engaged in misconduct. In Misco, the Supreme Court stated:

---

under which employee misconduct could never be just cause for discharge so long as the employee did not act willfully or callously. We disagree with this reading of the arbitrator's opinion. The arbitrator did not suggest that a finding of willful or callous misconduct was a prerequisite to discharging an employee. She used that language only to distinguish cases where nurses were discharged for conduct more egregious than Hartney's.

In pursuing its public policy inquiry, the Court of Appeals quite properly considered the established fact that traces of marijuana had been found in Cooper's car. Yet the assumed connection between the marijuana gleanings found in Cooper's car and Cooper's actual use of drugs in the workplace is tenuous at best and provides an insufficient basis for holding that his reinstatement would actually violate the public policy identified by the Court of Appeals "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." A refusal to enforce an award must rest on more than speculation or assumption.

Misco, 484 U.S. at 44.

Brigham & Women's Hospital, relied on heavily by the Hospital, also reflects a careful assessment of the nurse's suitability for continued employment. See Brigham & Women's Hosp., 684 F. Supp. at 1125. In that case, the district court was asked to decide whether an arbitrator's award reinstating a nurse violated public policy in favor of safe and competent nursing care. Over a period of several months, the nurse had exhibited difficulties with interpersonal and communication skills and had received warnings for four acts of professional misconduct.[9] In considering whether reinstating the nurse would

_____

[9] Specifically, the nurse inappropriately delegated care of a patient to other staff members, failed to notify a doctor of a patient's decline in status, called a physician to care for a patient without consulting her supervisors, and administered medication improperly. See Brigham & Women's Hosp., 684 F. Supp. at 1121.

-21-

violate public policy under those circumstances, the district court stated:

> Here, the Hospital is arguably correct in asserting the regulations establish a public policy that RN's be competent. Even assuming that there is such a policy, however, the Hospital has not shown reinstatement of [the grievant] would clearly violate that policy. The arbitrator did not find that [the grievant] was incompetent, or that [the grievant] was unable to properly carry out the basic responsibilities of an RN.

Id. Like the nurse in Brigham & Women's Hospital, there was no finding by the arbitrator that Hartney was incompetent or unable to perform her duties as a registered nurse. Compare Edgewood Convalescent Ctr. v. District 1199, New England Health Care Employees, Civ. A. No. 84-2457N, 1985 WL 5779 at * 2 (D. Mass. June 24, 1985) (vacating award reinstating employees where their conduct constituted "gross negligence" and manifested "a complete disregard for patient care"). Indeed, in contrast to employees in other cases, Hartney has not demonstrated a propensity to engage in multiple bad acts or an unwillingness to modify her behavior. See, e.g., Eastern Associated Coal, 531 U.S. at 66 (finding the "recidivism" of an employee who had tested positive for drugs twice insufficient to warrant discharge); Russell Mem'l Hosp. Ass'n v. United Steel Workers of Amer., 720 F. Supp. 583, 587 (E.D. Mich. 1989) (holding that

reinstating nurse with "a propensity for misconduct," and who was "reluctant to change her ways," violated the public policy in favor of competent nursing care). In the absence of such findings, we cannot conclude that Hartney's one act of professional negligence during her ten-year career, serious though it was, means that her reinstatement violates the public policy of Massachusetts promoting the competence of nurses and patient safety. See MidMichigan Reg'l Med. Center-Clare v. Prof'l Employees Div. of Local 79, 183 F.3d 497, 504 (6th Cir. 1999) ("Even highly skilled professionals err on occasion, and we think it clear that it cannot violate the public policy of Michigan to contract to retain a nurse guilty of committing some acts of carelessness.").

## IV. Conclusion

In reversing the district court's judgment granting summary judgment in favor of BMC, we do not minimize in any way the tragic death of Baby X. However, BMC has signed an arbitration agreement conveying substantial authority to the arbitrator to decide whether there is just cause for discharge; if BMC wants to reserve more authority to itself, it can easily seek to do so explicitly the next time the contract is up for renegotiation. Here, the arbitrator's interpretation of the collective bargaining agreement was within the scope of her

-23-

authority.  There is no public policy that prohibits Hartney's reinstatement under the circumstances of this case.

**Reversed and remanded for entry of judgment confirming the arbitrator's award**.