**MIDAMERICAN ENERGY COMPANY, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 499, Defendant.**

**No. 4–02–CV–90037.**

United States District Court, S.D. Iowa, Central Division.

Oct. 18, 2002.

Brenton D. Soderstrum, Des Moines, IA, Frank B. Harty, Des Moins, IA, for Plaintiff.

MacDonald Smith, Sioux City, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff MidAmerican Energy Company ("MidAmerican") brought this action under Section 301 of the National Labor Relations Act, 29 U.S.C. § 185(a) challenging the decision of a labor arbitrator requiring MidAmerican to reinstate an employee, Ronald Turner, ("Turner") who was terminated after violating certain safety regulations at the liquid natural gas ("LNG") storage facility where he was employed (the "Award"). The Court now has before it Plaintiff's Motion for Summary Judgment urging the Court to vacate the Award and Defendant's Motion for Partial Summary Judgment urging the Court to enforce the Award and compel the reinstatement of Turner pursuant to its terms. For the reasons set forth below, Plaintiff's Motion is denied and Defendant's Motion is granted.

## I. Factual Background

MidAmerican is a power utility which owns and operates an LNG plant in Waterloo, Iowa, where natural gas is stored in two 5 million gallon tanks on site. MidAmerican is party to a collective bargaining agreement (the "Agreement") with Defendant International Brotherhood of Electrical Workers, Local 499 (the "Union"), which represents hourly maintenance, security, and production personnel employed at the facility. The Agreement contains provisions on the terms and conditions of employment. Articles VI of the Agreement provides for binding arbitration in the event of a dispute.[1] Turner is an employee covered by the Agreement. He was hired by MidAmerican in 1980 and worked at the Waterloo facility as an "LNG Technician" for fourteen or fifteen years. His work record prior to the incident which triggered his termination was excellent.

The facts as presented during arbitration are as follows. On June 2, 2001, Turner received a call at work from his wife informing him that his teenage son

---

1. Article VI, Section 3 of the Agreement provides:

 The Company and the Union agree that the decision of [the] arbitrator on any matter properly referred to shall be final and binding on both parties.

could not be located. Turner then disabled approximately 40 security and monitoring devices in the control room, which were designed to provide fire warning, gas detection, perimeter security, and other similar services. He then left the plant in a MidAmerican vehicle, leaving his own vehicle parked in front of the plant so that his absence would be undetected. Turner was gone for approximately three hours. Some time after Turner abandoned his post, the plant's supervisor, David Pinkham, received an anonymous phone call notifying him that a company vehicle had been seen driving through a Waterloo neighborhood. Pinkham then proceeded to the plant and found it vacant. Plant rules provide, in part, that "[o]perators who are on duty do not leave the plant without permission of the duty supervisor. An operator will not be released from work unless he is relieved by a qualified operator or released by his supervisor." (Award at 5). By leaving the plant unattended, Turner also caused MidAmerican to be in violation of federal and state regulations requiring continuous monitoring of the LNG facility. *See, e.g.* 49 C.F.R. § 193.2441(c). When Turner returned to the plant at approximately 3:00 or 3:30 in the morning of June 3, 2001, Pinkham informed him that he was suspended pending an investigation of the matter. Management later determined that Turner should be terminated for "breach of [his] responsibility for the safety of our operations ...". (Award at 4). MidAmerican was required to self-report the incident to the Iowa State Utilities Board, which found the company in violation of mandated safety and security standards as a result of the incident.

Turner filed a union grievance challenging his termination, alleging a violation of Article V, Section 8 of the Agreement which provides that "[t]he Company shall not discharge, demote, or suspend a regular employee without just cause." The parties referred the matter to arbitration and submitted the following issues: (1) Was Turner terminated for just cause? and (2) If not, what shall the appropriate remedy be? During arbitration, MidAmerican argued that Turner's abandonment of the facility and his deliberate attempts to conceal his actions constituted such a serious breach of his responsibilities that termination was warranted, particularly in light of the serious risks to the surrounding community were an explosion to have occurred. The Union countered that Turner's long tenure and excellent record weighed against such a serious penalty and that his actions had been motivated by concern for his son.

On December 26, 2001, the arbitrator entered the Award, ordering Turner's termination to be reduced to a penalty of suspension without back pay. MidAmerican was ordered to reinstate Turner in either his original position, or, in its discretion, to transfer him to another position in the bargaining unit where he would be subject to more direct supervision.[2] The

---

**2.** The precise terms of the Award are as follows:

> Based on the foregoing analysis of the evidence, I find that while [Turner's] actions constitute just cause for discipline, his lengthy and otherwise unblemished service with the Utility warrants a reduction in the most severe of workplace penalties (termination). Accordingly, Mr. Turner's discharge shall forthwith be reduced to a suspension without any back pay. Further,

> should Management determine that he can no longer occupy a position of trust such as he held on June 22nd of this year, they may disqualify him from that job and transfer him to another position in the bargaining unit where more direct supervision is available. Hopefully, [Turner] will have learned from this experience the importance of trust, and the need for adhering to the requirements of his job assignment—whatever they might be. Should that again prove not to be the case, however, then a

arbitrator did not credit Turner's justification for leaving his post, but rather based his decision on Turner's long "and otherwise unblemished" record, together with the fact that throughout the proceedings, Turner "admitted to the charges against him," "took responsibility for his actions," and "knew them to be a violation of the trust that the Employer had placed in him." The arbitrator also found that Turner "cooperated at all times with Management" during their investigation and "consistently owned up to what he did." (Award at 8, 12–13).

On or about January 4, 2002, Pinkham received an anonymous phone call stating that Turner had lied about his whereabouts on June 2, 2001 and identifying Carol Carey ("Carey") as having relevant information. Pinkham subsequently contacted Carey, who informed him that Turner was with her on June 1–2, 2001 and was not looking for his son, contrary to Turner's sworn testimony during the arbitration proceedings. MidAmerican later deposed Carey, who testified that she was having an extramarital relationship with Turner and that Turner was at her house during the hours he was away from the facility.

MidAmerican filed its appeal in this Court on January 17, 2002 challenging the Award. The Union counterclaimed for enforcement of the Award. Both parties have now moved for summary judgment.

## II. Legal Standards

### A. Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." An issue is "genuine," "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if the dispute over it might affect the outcome of the suit under the governing law. *Id.*

The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322–323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. In order to survive a motion for summary judgment, the nonmoving party must present enough evidence for a reasonable jury to return a verdict in his or her favor. *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505.

On a motion for summary judgment, the Court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *United States v. City of Columbia*, 914 F.2d 151, 153 (8th Cir.1990). The Court does not weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The Court only determines

---

more severe penalty may well be justified. (Award at 13).

whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

## B. Judicial Review of an Arbitral Award

 Federal law, and in particular the Labor Management Relations Act of 1947, 29 U.S.C. § 173(d) "reflect[s] a decided preference for private settlement of labor disputes without the intervention of government." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). Accordingly, a court's review of a labor arbitration award is extremely limited. *Iowa Electric Light and Power Co. v. Local 204, IBEW*, 834 F.2d 1424, 1426–27 (8th Cir. 1987). "The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *Misco*, 484 U.S. at 36, 108 S.Ct. 364. An award is legitimate unless it 1) exceeds the arbitrator's contractual authority, or 2) fails to "draw its essence from the collective bargaining agreement," but rather merely represents the arbitrator's "own brand of industrial justice." *Id.* at 38, 108 S.Ct. 364; *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The "courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. 1358.

 The strict limits on judicial scrutiny of arbitral decisions are clear. Nonetheless, under the narrow public policy exception articulated in *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers*, an arbitral award may be vacated if it violates an explicit, well-defined, and dominant source of public policy, as "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). In addition, arbitral awards procured by the parties through fraud or the arbitrator's dishonesty should not be enforced. *Misco*, 484 U.S. at 38, 108 S.Ct. 364.

## III. Discussion

MidAmerican's Motion for Summary Judgment asserts that the Award should be vacated on the following grounds: (1) the arbitrator exceeded his authority under the Agreement and thus the award does not "draw its essence" from the Agreement; (2) the Award was procured by fraud, namely Turner's allegedly perjured testimony during the arbitration proceedings regarding his whereabouts on the night in question; and (3) the Award violates a well-defined and dominant public policy, as manifested by federal and state law. The Union's Motion for Partial Summary Judgment on its counterclaim raises identical issues and argues the Award should be enforced. The Court will consider each of the challenges to the Award in turn.

## A. The Scope of the Arbitrator's Authority and Whether the Award "Draws its Essence" from the Agreement

The first task confronting the Court is to answer the related questions of whether the Award exceeded the arbitrator's contractual authority or fails to "draw its essence from the collective bargaining agreement." *Misco*, 484 U.S. at 38, 108 S.Ct. 364.

 MidAmerican argues that the arbitrator exceeded his authority under the Agreement because he found that MidAmerican lacked "just cause" to discharge

Turner, but at the same time permitted MidAmerican to bar Turner from his original position if it chose to do so. MidAmerican further argues that authorizing Turner's reinstatement to a different position "flies in the face" of negotiated provisions of the Agreement concerning negotiated job descriptions, job content,[3] assignment for temporary transfers,[4] job seniority and bidding,[5] and the impact of rule violation on an employee's job security.[6] (Plaintiff's Resistance at 4–5). MidAmerican contends that the remedy fashioned by the arbitrator forces it to either return an untrustworthy employee to a critical position or involuntarily assign another employee to fill his post.

■ None of these arguments are persuasive. The arbitrator's authority is first derived from Article VI, Section 2 of the Agreement, which confers on him authority "over any disputes … growing out of grievances concerning discipline/discharge actions or interpretation or application of any terms of this Agreement." The only express restriction on this broad authority is that the arbitrator is "limited to the interpretation of this Agreement and to the application of its provisions to the particular grievance case under consideration." These provisions include Article V, Section 8 of the Agreement, which requires "just cause" before MidAmerican can "discharge, demote, or suspend" a regular employee. The Agreement contains no restrictions other than the limits of Article VI that would cabin the arbitrator's authority to determine whether just cause exists for a discharge under Article V, Section 8 or to craft an appropriate remedy if no just cause were found. MidAmer-

ican's argument to the contrary is essentially that unless the Agreement expressly authorizes the specific remedy ordered by the arbitrator (which the Agreement here does not), then the arbitrator's award exceeds his authority. (Plaintiff's Resistance at 5–6). The Court does not agree. "Where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." *Misco*, 484 U.S. at 38, 108 S.Ct. 364. *See also Boston Medical Center v. Service Employees Int'l. Union, Local 285*, 260 F.3d 16, 22–23 (1st Cir.2001) (finding a lesser penalty consistent with a collective bargaining agreement that did not mandate discharge, and recognizing awards upheld by other circuits "where an arbitrator concluded that a concept of progressive discipline was contemplated by a provision requiring a finding of just cause before an employee is discharged").

Moreover, the parties submitted to the arbitrator the issues of whether there was just cause for Turner's termination and what the appropriate remedy should be in the absence of just cause. Thus, the arbitrator's determination that (1) no just cause for discharge existed, (2) just cause did exist for a lesser penalty, and (3) suspension without back pay was an appropriate remedy are within the express authorization conferred both by the Agreement and by the parties submissions to the arbitrator. *Bureau of Engraving, Inc. v. Graphic Communication Int'l. Union, Local 1B*, 284 F.3d 821 (8th Cir.2002) (citing *Local 238 IBT v. Cargill*, 66 F.3d 988, 990–

---

3. Article VII, Section 2 of the Agreement.

4. Article X, Section 5 of the Agreement.

5. Article XIII, Section 6 of the Agreement.

6. Art. XI, § 5.1 of the Agreement states that "job security protection does not extend to

any employee who violates rules of conduct applicable to all employees. Some examples of rule violations would be acts of dishonesty, unsatisfactory performance, insubordination, etc."

91 (8th Cir.1995) for the rule that "when two parties submit an issue to arbitration, it confers authority upon the arbitrator to decide that issue."); *Daniel Constr. Co. v. Intl. Union of Oper. Engineers, Local 513,* 738 F.2d 296, 300 (8th Cir.1984) (refusing to set aside an award not specifically provided for in a collective bargaining agreement where the parties had submitted the issue of appropriate remedy for arbitration).

■ Having concluded that the Award rendered was within the contractual authority of the arbitrator, the Court must next determine whether it also "draws its essence" from the Agreement. *Misco,* 484 U.S. at 38, 108 S.Ct. 364 (stating that an arbitral award cannot be upheld unless it "draw[s] its essence from the [Agreement]. [It] cannot simply reflect the arbitrator's own notions of industrial justice."); *Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. 1358. MidAmerican asserts the same grounds discussed above as evidence that the Award represents "the arbitrator's own notions of industrial justice" and once again, the Court finds these arguments unavailing. The test is whether the arbitrator "is even arguably construing or applying the contract and acting within the scope of his authority." *Misco,* 484 U.S. at 38, 108 S.Ct. 364. If he has done so, even a court's finding of "serious error" is not sufficient grounds to overturn the award. *Id.*

■ The Award requires Turner's reinstatement to *some* position, but leaves open to MidAmerican the option of where to place him. The Court does not agree that the flexibility the Award gives to MidAmerican renders it unenforceable. *See Misco,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (upholding a reinstatement award which permitted the employer, at its option, to transfer the grievant to a different position). Assuming that MidAmerican objects to this alternative remedy as

some evidence of internal inconsistency in the award (which the Court does not believe it is), internal inconsistencies within an arbitral judgment are not grounds for vacatur. *See Saint Mary Home, Inc. v. Serv. Employees Int'l Union, Dist. 1199,* 116 F.3d 41, 44–45 (2nd Cir.1997) ("Internal inconsistencies in the opinion are not grounds to vacate the award notwithstanding [the movant's] plausible argument that the arbitrator's decision was misguided or our own concerns regarding the arbitrator's conclusion."). As the Agreement contains no restrictions on the arbitrator's right to fashion such a remedy, the arbitrator cannot be said to have "ignore[d] the plain language of the contract" or to have rendered an award reflecting merely his "own notions of industrial justice" rather than the "essence" of the Agreement. *Misco,* 484 U.S. at 38, 108 S.Ct. 364; *Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. 1358. Furthermore, Article V, Section 8 of the Agreement itself contemplates that just cause may exist for lesser penalties, such as suspension or demotion, even where just cause is not found to uphold a discharge. The provisions of the Agreement regarding various positions and policies of the company regarding job placement and job security do not limit the possible remedies an arbitrator may devise and they do not alter the Court's conclusion here.

Finally, the Court is not swayed by MidAmerican's assertion that the Award does not derive from the "essence" of the Agreement because it forces MidAmerican to either return Turner to a position of trust or incur the burden of filling his post. If MidAmerican had prevailed at arbitration, Turner's discharge would have been upheld and MidAmerican would have to fill the vacancy in any event. The real bone of contention is MidAmerican's objection to being required to reinstate Turner at all. The imposition of the Award on Mi-

dAmerican against its wishes does not demonstrate that the arbitrator exceeded his authority under the Agreement.

## B. Fraud

 MidAmerican's Motion further urges the Court to vacate the Award under Section 10(a) of the FAA on the basis of Turner's alleged perjury during the arbitration proceeding. Section 10 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 10, provides that "the United States district court in and for the district where the award was made may make an order vacating the award upon the application of any party to the arbitration ... where the award was procured by corruption, fraud, or undue means." Although the FAA does not apply to labor arbitration awards, the federal courts have looked to the FAA for guidance in fashioning federal common law in labor arbitration cases. *Misco*, 484 U.S. at 41 n. 9, 108 S.Ct. 364; *American Postal Workers Union, AFL–CIO v. U.S. Postal Service*, 52 F.3d 359, 362 (D.C.Cir.1995). An arbitral award may be vacated pursuant to Section 10(a) only if: (1) the movant establishes the fraud by clear and convincing evidence; (2) the fraud was not discoverable upon the exercise of due diligence prior to or during the arbitration; and (3) the movant demonstrates that the fraud materially related to an arbitrated issue. *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir.1988); *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293 (9th Cir.1982). *See also Goff v. Dakota, Minnesota & Eastern R.R. Corp.*, 276 F.3d 992 (8th Cir.2002) (applying an identical standard set forth in 45 U.S.C. § 153(q) of the Railway Labor Act to a Public Law Board determination). The parties do not dispute that the alleged fraud by Turner was not discoverable prior to or during the arbitration. However, the Court finds that MidAmerican cannot meet its burden as to the first and third requirements of the test.

 This Court is constrained from engaging in credibility determinations on a motion for summary judgment. *Anderson*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. Given this limitation, the Court cannot find as a matter of law that MidAmerican's evidence of Turner's alleged perjury is "clear and convincing." During the arbitration, Turner's wife confirmed that she and her husband were worried about their son's whereabouts on the night of June 2, 2001. Her testimony appeared to corroborate the testimony of Turner that he had abandoned the plant to search for his son. Ms. Carey's testimony, if true, casts doubt on the veracity of Turner's testimony during the arbitration and diminishes the relevance of his wife's statements. To credit one version of events over the other would be to make a credibility determination that the Court is not prepared to do.[7] Therefore, Ms. Carey's testimony cannot itself stand as "clear and convincing evidence" of fraud.

 Even if the Court assumes that Ms. Carey's testimony is sufficient proof that Turner's testimony during arbitration was perjured, MidAmerican cannot show that the alleged fraud materially related to an issue in the arbitration. In the context of cases asserting "undue means" or arbitrator impropriety, the Eighth Circuit has interpreted the "materiality" requirement of the Section 10(a) test to demand a showing that the conduct affected the outcome of the arbitration. *Delta Mine Holding Co. v. AFC Coal Properties, Inc.*, 280 F.3d

---

7. To illustrate the danger of adopting either version at this stage, the Court notes, without crediting this view, that it is not inconceivable that the two "versions" of the story can be reconciled—that Turner left his post to look for his son, but after leaving, made his way to Ms. Carey's.

815 (8th Cir.2001). The Court applies the same standard here. *See Newark Stereo-typers' Union No. 18 v. Newark Morning Ledger Co.,* 397 F.2d 594, 599 (3rd Cir.), *cert. denied* 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1968) (fraud must deprive party of fair hearing). The arbitrator expressly declined to credit the reason Turner gave for leaving his post as having any bearing on the ultimate award of reinstatement, finding it "less than persuasive". Rather, the arbitrator based the Award on a determination that Turner's "lengthy and otherwise unblemished service with the Utility warrants a reduction in the most severe of workplace penalties (termination)." Because the Award was grounded on Turner's long tenure and clear record, rather than either his trustworthiness or his asserted justification, MidAmerican cannot establish that the truth or falsity of Turner's stated reason for abandoning his worksite is materially related to an issue in the arbitration.

MidAmerican, however, argues that Turner's allegedly perjured testimony was materially related to an issue in the arbitration since his alleged deception contradicts the arbitrator's finding that Turner "cooperated at all times with Management" during its investigation and "consistently owned up to what he did." (Award at 12). The arbitrator also considered the fact that Turner admitted. his misconduct, "took responsibility for his actions," and "knew them to be a violation of the trust that the Employer had placed in him." (Award at 8). Once again, the Award itself was based on Turner's long tenure, not his "forthrightness" or cooperation. In addition, the arbitrator found reinstatement appropriate notwithstanding Turner's admissions of deliberate dishonesty and deception at the time of the incident and the arbitrator's conclusion that Turner's proffered justification could not be credited. Therefore, the Court cannot conclude that evidence, if shown, proving

Turner's excuse was wholly fabricated rather than merely doubtful would have affected the outcome of the arbitration. Turner's alleged perjury is not sufficient grounds for vacatur of the Award here.

**C. Public Policy Exception**

Having found that the arbitrator acted within the scope of his contractually delegated authority, that the Award "draws its essence" from the Agreement, and that the Award should not be vacated as procured by fraud under Section 10(a) of the FAA, the Court now addresses the more difficult issue of whether the Award should be vacated under the narrow public policy exception to the general rule of judicial deference to arbitral determinations. For purposes of this analysis, the Court treats the Award as representing a contractual agreement of the parties and therefore assume that the Agreement itself calls for Turner's reinstatement. *See Eastern Assoc. Coal Corp. v. United Mine Workers of America, Dist. 17,* 531 U.S. 57, 61–62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000). The issue, then, is whether such a contractual reinstatement requirement would violate public policy. *Id.* The Court concludes that it does not.

Although the courts accord "near-total deference" to arbitral decisions, a court "may not enforce a collective-bargaining agreement that is contrary to public policy." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); *Local 97, IBEW v. Niagara Mohawk Power Corp.,* 196 F.3d 117, 125 (2nd Cir.1999) *(Niagara Mohawk II ).* As MidAmerican acknowledges, this public policy exception is a narrow one and the burden rests on MidAmerican as the party asserting the exception to establish its existence in this case. *Niagara Mohawk II,* 196 F.3d at 125.

As set forth above, an arbitral award may only be vacated if its terms violate an "explicit," "well-defined" and "dominant" public policy, as "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). In *Eastern Associated Coal*, the Supreme Court reaffirmed the principle, articulated in *Misco*, that the question of whether an arbitral award violates a demonstrated public policy turns on an assessment of the terms of the award, rather than the underlying conduct of the employee. *Eastern Assoc. Coal*, 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 ("the question ... is not whether [the employee's] conduct itself violates public policy, but whether the agreement to reinstate him does so"); *Misco*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286. The Supreme Court in *Eastern Associated Coal* also stressed that the relevant statutory and regulatory provisions must be construed against the background labor law policy favoring determination of disciplinary questions through arbitration when chosen by labor-management negotiation. *Eastern Assoc. Coal*, 531 U.S. at 65, 121 S.Ct. 462, *citing California Brewers Assn. v. Bryant*, 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980). The Court reads these teachings of the Supreme Court as calling into question prior case law grounding a public policy analysis on an assessment of the conduct of the grievant or its seriousness. *Eastern Associated Coal* also stands as a strong reminder that courts are only to refuse enforcement of arbitral awards in exceptional circumstances.

MidAmerican asserts that the Eighth Circuit's holding in *Iowa Electric Light and Power Co. v. Local 204, IBEW*, 834 F.2d 1424 (8th Cir.1987), is controlling here on the public policy issue. *Iowa Electric* affirmed a district court decision to vacate an arbitrator's award ordering the reinstatement of a nuclear plant employee who deliberately violated federally mandated safety regulations. The Eighth Circuit found that the extensive regulation of nuclear facilities demonstrated a "well-defined and dominant policy requiring strict adherence to nuclear safety rules." *Id.* at 1427. The Court of Appeals also relied on the fact that nuclear power plants are subject to the oversight of a federal regulatory agency as evidence of the heightened public policy interest at stake in the case. *Id.* at 1472 n. 2 (distinguishing *Misco* in part on that basis). MidAmerican maintains that an equally well-defined public policy exists mandating the safe operation of natural gas storage facilities, that, as in *Iowa Electric*, would be violated by the reinstatement of Turner.

The question of whether the Award violates public policy therefore requires the Court to determine the extent to which *Iowa Electric* governs the instant case, in light of the more recent decision of the Supreme Court in *Eastern Associated Coal*. In this regard, the Court does not assume, as MidAmerican urges, that the Eighth Circuit's finding of a clear public policy prohibiting reinstatement in the context of nuclear regulation necessitates a similar finding with regard to LNG facilities. The heightened risks associated with nuclear facilities may well require a level of regulation and compliance that differs materially from those present in the context of LNG facilities, and the Court must consider that possibility.

It is undisputed that LNG facilities, like nuclear facilities, are subject to extensive regulatory oversight. Both state and federal regulations mandate the monitoring of LNG facilities and dictate safety procedures that must be followed in order to ensure the safety of the public. *See* 49 C.F.R. § 193.2001 *et seq.*; Iowa Admin.

Code r. 199–10.1(479) (2001) *et seq.* State officials are authorized to inspect LNG facilities, and failure by a facility to comply with state and federal regulations could result in sanctions. Iowa Admin. Code r.199–10.11 (479) (2001). The Court finds that these regulations and the oversight provided by the federal Department of Transportation through the Iowa Utilities Board establish a well-defined, dominant public policy requiring compliance with safety regulations at LNG facilities.

However, the ultimate inquiry is not whether there is a dominant public policy of safety or of compliance with safety regulations, but whether an explicit, well-defined, dominant public policy bars reinstatement of an employee who has violated them. *Eastern Assoc. Coal,* 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354; *Weber Aircraft v. General Warehousemen and Helpers Union, Local 767,* 253 F.3d 821 (5th Cir.2001) (finding a dominant public policy against sexual harassment, but no public policy that every harasser should be fired). As an initial matter, the Court notes that none of the regulations applicable to LNG facilities expressly mandate a discharge or prohibit the reinstatement of an employee who has committed a violation. But the inquiry cannot end here. Neither the Supreme Court nor the Eighth Circuit have interpreted the public policy exception to *require* that enforcement of an award be actually *illegal* before the exception applies. *Eastern Assoc. Coal,* 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 ("The courts' authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law."). *See also Boston Med. Center v. SEIU,* 260 F.3d 16, 25 (1st Cir.2001); *Iowa Electric,* 834 F.2d at 1427 & n. 3. Indeed, the Supreme Court in *Eastern Assoc. Coal* did not end its analysis with a finding that discharge was mandated or reinstatement prohibited by the applicable regulations, but rather went on to consider whether the award could be enforced consistent with the underlying objectives of the regulations. *Eastern Assoc. Coal,* 531 U.S. at 64–66, 121 S.Ct. 462. The Court therefore turns its attention to the question of whether Turner's reinstatement would undermine the policy objectives of the LNG regulations.

The Eighth Circuit concluded in *Iowa Electric* that strong public policy would indeed be violated by a nuclear facility employee's reinstatement, even though the award would not violate any express statutory provisions. Nonetheless, the Court finds that the regulatory scheme enforced by the Nuclear Regulatory Commission ("NRC") is more stringent than that applicable to LNG facilities, particularly with regard to personnel qualifications. *See, e.g.* 10 C.F.R. § 73.56 (requiring licensees to limit unescorted access to critical areas to "trustworthy and reliable" individuals), *cited in Niagara Mohawk II,* 196 F.3d at 123 n. 3. Nuclear facility licensees must enforce these personnel guidelines. *Id.* at 127–29. Personnel in security-sensitive positions at a nuclear facility are also subject to federally mandated psychological screening. *See Daniel Construction Co. v. Local 257, IBEW,* 856 F.2d 1174 (8th Cir. 1988). Neither the federal nor the state regulations regarding LNG facilities contain analogous requirements, though they do require personnel to satisfy experience and training qualifications. *See, e.g.* 49 C.F.R. § 193.2701 *et seq.* Given the distinctions between the LNG safety regulations and the heightened, "strict" safety mandates which apply to nuclear facilities, the Court cannot agree that *Iowa Electric* compels a conclusion that reinstatement in a safety-sensitive post at an LNG plant will undermine the public safety policy rationale of the LNG regulations.

Furthermore, Eighth Circuit cases since *Iowa Electric* explain its result as based in some degree on the seriousness of the employee's conduct. *See, e.g. Homestake Mining Co. v. United Steelworkers, Local 7044*, 153 F.3d 678, 681 (8th Cir.1998) ("Although we have expressed public policy concerns about an award that reinstated an employee despite a finding that the employee grossly and deliberately violated important safety regulations ... in the absence of such a finding here, no similar concerns arise.") (citing *Iowa Electric*); *PaineWebber, Inc. v. Agron*, 49 F.3d 347 (8th Cir.1995) (citing *Iowa Electric* for the proposition that "there may generally be a relation between the underlying conduct and the likelihood that an arbitration award relating to that conduct violates public policy," though acknowledging that conduct must not be the focus of analysis). To the extent *Iowa Electric*'s result was indeed motivated by the relative seriousness of the employee's conduct, the Court views it to be modified by *Eastern Associated Coal*. Consequently, the Court concludes its assessment here of the enforceability of the Award cannot be determined by the "egregiousness" of Turner's conduct, even as compared to the conduct of the grievant in *Iowa Electric*.[8]

Second, pre-*Eastern Associated Coal* cases from other circuits applying the public policy exception in the context of chemical and gas plants have not relied on a dominant public policy against reinstatement following safety violations in these regulated industries. Rather, courts have cited precedent vacating reinstatement to "safety-sensitive positions," broadly defined, but have based vacatur of reinstatement awards instead on the existence of a clear public policy against substance abuse in a "safety-sensitive" workplace. *See, e.g. Gulf Coast Indust. Workers Union v. Exxon Co.*, 991 F.2d 244 (5th Cir.1993) (petrochemical refinery); *Georgia Power Co. v. Int'l Bhd. of Elect. Workers, Local 84*, 707 F.Supp. 531 (N.D.Ga.1989), *aff'd*, 896 F.2d 507 (11th Cir.1990) (utility plant); *Exxon Corp. v. Local Union 877, Int'l. Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 980 F.Supp. 752 (D.N.J.1997), *aff'd* 162 F.3d 1150 (3rd Cir.1998) (petrochemical plant). While these cases are admittedly distinguishable from the case before the Court, which raises no issues of substance abuse or countervailing policies favoring rehabilitation, the Court finds significant the apparent unwillingness of these courts to ground reversal of a reinstatement award on a finding of a public policy favoring strict compliance with safety regulations in these industries. If such a clear industry-based public policy existed, it would seem to provide at least alternative support in those cases where the courts have vacated a reinstatement award.

A number of other pre-*Eastern Associated Coal* cases cited by the parties and by the Eighth Circuit in *Iowa Electric* have vacated reinstatement awards in other "safety-sensitive" contexts on public policy grounds. *See e.g. Union Pacific R.R. v. United Transp. Union*, 3 F.3d 255 (8th Cir.1993) (public policy against use of drugs by railroad employees); *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357 (3rd Cir.1993) (*Exxon I*) (public policy of safe operation of vessels);

**8.** The Court recognizes that at least one circuit addressing this issue since *Eastern Associated Coal* has adopted a different view. *See Boston Med. Center v. SEIU*, 260 F.3d 16 (1st Cir.2001) (stating, though not so finding on the facts of the case, that "even in the absence of a specific law or regulation barring reinstatement ..., we acknowledge that there might be conduct so egregious that reinstatement might threaten the general public policy promoting [competent nursing care]."). However, the Court cannot accept the First Circuit's interpretation as consistent with its understanding of *Eastern Associated Coal*.

*Exxon Shipping Co. v. Exxon Seamen's Union,* 11 F.3d 1189 (3rd Cir.1993) (*Exxon II* ) (public policy against reinstatement of intoxicated operator to "safety-sensitive" post); *Amalgamated Meat Cutters, Local Union 540 v. Great Western Food Co.,* 712 F.2d 122 (5th Cir.1983) (public policy against reinstatement of alcohol-drinking truck driver). However, *Eastern Associated Coal* counsels courts to use caution in scrutinizing arbitral awards of reinstatement absent an express bar on the remedy as delineated in "positive law". 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 (stating that while "the public policy exception is not limited solely to instances where the arbitration award itself violates positive law, [n]evertheless, the public policy exception is narrow and must satisfy the principles" of *W.R. Grace* and *Misco.*").[9] Accordingly, the Court finds cases arising in these very different regulatory contexts can no longer provide clear guidance on the application of the public policy exception to a case involving an LNG facility.

■ However, consideration of other relevant factors supports the Court's conclusion that enforcement of the Award would not undermine the underlying objectives of the LNG regulations. First, a regulatory agency's explicit approval of the discharge and reprimand of the company may support a finding of a clear public policy against reinstatement. *Iowa Electric,* 834 F.2d at 1428. *See also Stead Motors v. Automotive Machinists,* 886 F.2d 1200, 1214–15 (9th Cir.1989) (distinguishing *Iowa Electric* as based in part on an *"ad hoc* [public policy] expressed through a specific regulatory determination regarding the grievant"). Although MidAmerican was reprimanded here by the state agency for the security breach Turner committed, the agency, unlike the NRC in *Iowa Electric,* did not indicate its approval of the discharge. While its reprimand confirms that Turner's conduct indeed violated the regulations, this is uncontested and irrelevant to the Court's assessment of the terms of the Award. The agency's silence as to Turner's discharge cannot be construed as strong evidence of a public policy forbidding reinstatement in this case.

The Award could also be found contrary to a public-safety policy such as the one established by the LNG regulations if it "condon[ed] an employee's conduct or ignor[ed] a safety risk". *See Eastern Assoc. Coal,* 531 U.S. at 65–66, 121 S.Ct. 462. Here, the Award, as in *Eastern Associated Coal,* does not condone Turner's conduct, but punishes Turner by suspending him without back pay, depriving him of lost wages. Also as in *Eastern Associated Coal,* the Award recognizes that a more severe penalty might be warranted if Turner proves himself unable to perform his job in a trustworthy manner after reinstatement.

■ An award may also be deemed to contradict the policy objectives of the LNG regulations if it prevents the company from complying with its safety mandate. *EEOC v. Indiana Bell Tel. Co.,* 256 F.3d 516, 524 (7th Cir.2001) (holding that "no award that requires an employer to tolerate an ongoing violation of [Title VII] can be enforced.") (citing *Eastern Assoc. Coal.*); *Union Pacific,* 3 F.3d at 262 (concluding that where the employee "poses a significant risk to the public because of his potential for future drug use on the job," his reinstatement would force the employer to be in violation of applicable regulations and therefore was against public policy); *Stead Motors v. Automo-*

**9.** Justice Scalia refers in his concurrence to the second sentence as a "giant Do Not Enter sign".

*tive Machinists,* 886 F.2d 1200, 1217 (9th Cir.1989) ("[I]t is only if the grievant is likely to engage in wrongful conduct which violates public policy in the future that his reinstatement could be said to violate public policy"). Here, by contrast, the arbitrator did not find that Turner posed a future safety risk, though he acknowledged the possibility that Turner might in future prove untrustworthy. Nor has MidAmerican argued that Turner's reinstatement would compromise its compliance with regulations by encouraging other employees to disregard safety regulations. The company's primary objection to the reinstatement is that Turner cannot be trusted and if he is returned to his post, the company will run the risk of monetary sanctions if he again commits a safety violation. But a refusal to enforce an arbitral award on public policy grounds "must rest on more than speculation or assumption." *Misco,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286.

Even if this risk of future violation were enough to justify vacating the Award, the terms of the Award, like the award in *Misco,* permit MidAmerican to place Turner in other positions that will not pose the same risks to public safety. Although the arbitrator did not determine whether Turner was qualified for other positions or whether such positions are available, MidAmerican has made no argument and provided no evidence to the contrary on these Motions. The Union has submitted alternative job descriptions and the affidavit of MidAmerican employee Krause, which indicate that a number of positions exist which do not involve placement at an LNG facility or fall within the scope of the LNG safety regulations and for which the only mandatory qualifications are a valid driver's license and clear drug and alcohol testing. (Krause Affidavit and Exhibits). MidAmerican has not shown that Turner's reinstatement would violate its safety mandate or otherwise undermine the policy objectives of the LNG regulations. No genuine issues of material fact exist and the Union is entitled to judgment as a matter of law.

## D. Scope of Defendant's Counterclaim

The Union's counterclaim for breach of contract seeks as an additional remedy back wages and benefits for Turner for the period commencing from the issuance of the Award until his reinstatement. (Defendant's Answer & Counterclaim at 5. Although the Union views this remedy as an additional counterclaim not within its Partial Motion for Summary Judgment and neither party has presented arguments on this request to the Court, the Court deems the Union's prayer for "lost wages and benefits" to be an additional remedy requested by the Union rather than a separate counterclaim.[10] The Court is aware of no authority supporting a remedy of this nature, which would penalize MidAmerican for appealing the Award as it has a right to do under 29 U.S.C. § 185. The proper remedy where a party has refused compliance with an arbitral award is to bring an action for enforcement of the award, as the Union has done here. The Court has determined to defer to the judgment of the arbitrator with regard to the appropriate remedy in this matter and will not extend additional relief to the grievant where the arbitrator has declined to do so. Therefore, Defendant's Motion for Partial Summary Judgment shall be deemed a Motion for Summary Judgment on its entire counterclaim and the only appropriate remedy is the

---

**10.** The only mention of the Union's "claim" for lost wages and benefits appears as a prayer for damages arising out of the alleged failure of MidAmerican to immediately comply with the terms of the Award.

enforcement of the Award against MidAmerican in accordance with its terms.

## IV. Order

Plaintiff's Motion for Summary Judgment is hereby **denied**. Defendant's Motion for Partial Summary Judgment is deemed a Motion for Summary Judgment and is hereby **granted**. MidAmerican is hereby ordered to reinstate Ronald Turner to his former position or to an alternative position in accordance with the terms of the Arbitration Award.

IT IS SO ORDERED.